

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-11-00197-CV

CITY OF HALTOM CITY                                        APPELLANT

V.

BRIAN AURELL, INDIVIDUALLY                                 APPELLEES
AND AS NEXT FRIEND OF
RANGER HUNTER AURELL, A
MINOR; JACKI CHANTELL
SEXTON-AURELL, INDIVIDUALLY;
AARON COLLINS, INDIVIDUALLY
AND AS REPRESENTATIVE OF
THE ESTATE OF ALEXANDERIA
COLLINS; AND NATASHA
COLLINS, INDIVIDUALLY AND AS
REPRESENTATIVE OF THE
ESTATE OF ALEXANDERIA
COLLINS AND AS NEXT FRIEND
OF CHESLEA MCMASTER

----------

FROM THE 48TH DISTRICT COURT OF TARRANT COUNTY

----------

# OPINION

----------

In this interlocutory appeal,[1] appellant City of Haltom City (the City) appeals the trial court's order denying its motion for summary judgment concerning the claims brought by appellees, whom we have listed above.  In five issues, the City argues that the trial court does not have jurisdiction over appellees' claims because the City's immunity has not been waived.  We reverse the trial court's order denying the City's motion for summary judgment, and we render a judgment dismissing appellees' lawsuit against the City with prejudice.

## Background Facts

Over the course of many years prior to June 2007, Skyline Mobile Home Estates (Skyline), which is located in the northern part of Haltom City, flooded numerous times when the City received heavy rain.  During those floods, members of the Haltom City Fire Department (HCFD) would sometimes have to evacuate and rescue people who were in Skyline and to barricade some areas of Skyline to make them inaccessible.  In March 2007, for example, members of the HCFD, at their own risk, performed a swift water rescue in Skyline.  In that flood, approximately forty people were evacuated, and several homes sustained damage.  Between March 2007 and June 2007, the City did not take any action

---

[1]*See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(8) (West Supp. 2012).

2

to protect Skyline's residents from flooding except creating a policy that allowed the mayor to force evacuations in the event of another flood.

Parts of Skyline are in low-lying areas near Whites Branch Creek, and those parts are therefore prone to flooding.[2]  The HCFD, on its own initiative, therefore monitored Skyline, the City's worst area for flooding, during times of heavy rain.  But neither Skyline nor the City regularly informed Skyline's residents of the danger of flooding there before June 2007.

On the night of June 17, 2007, storms with heavy rain moved into the North Texas area.  At about midnight, an HCFD lieutenant, Greg Wagner, went to Skyline.  At that time, it was not raining, there was no flooding, and the forecast did not call for more heavy rain.  After midnight, in the early morning of June 18, the HCFD received a call from the city of Keller about flooding there, and members of the HCFD used a boat to rescue people who were trapped on the roof of a car that was in swift-flowing floodwater.

At 1:30 a.m. on June 18, Skyline was not flooding.  But by about 2 a.m., when Lieutenant Wagner and other HCFD employees, including HCFD Chief Wes Rhodes, returned to Skyline with the same boat that they had used in Keller, they found that water had risen past the banks of the creek.[3]  Eventually, Skyline

_____

[2]Whites Branch Creek enters the City at its northeast corner, which is about half of a mile north of Skyline, and the creek flows south.

[3]The record indicates that runoff from other cities flowed into Haltom City and caused the creek's water level to rise.

3

residents began to call 911; the water had risen several feet and was high enough that some residents had to get on the roofs of their mobile homes. Although Lieutenant Wagner had worked for the HCFD for many years, he had never seen flooding that bad in Skyline. Several cities, including Fort Worth, sent crews to Skyline. Lieutenant Wagner, along with others, entered Skyline to rescue dozens of its residents, including a man and a child who were holding onto a tree. At least twenty-four HCFD personnel responded to the emergency at Skyline.

Jacki Chantell Sexton-Aurell and her husband, Brian, lived in Skyline in June 2007. On June 17, a couple of hours before midnight, Jacki noticed that there was some water in the trailer park, but the water was not in the streets, and it was not raining at that time, so Jacki went to sleep. At around midnight, Jacki awoke and saw that the water had risen to near the door of her house, which was elevated about four feet off of the ground. Jacki and her eight-year-old stepson, Ranger, could not get out of their home, so Jacki called 911. When Jacki and Ranger went to Jacki's bedroom, Jacki smelled gas inside her trailer and called 911 again. After the water rose more, the mobile home exploded. The explosion threw Jacki and Ranger out of a window and caused them to suffer severe burns. Rescuers eventually reached them and took them to an ambulance. An engineer later opined that the Aurells' home had shifted because it was not properly tied to the ground. When the home shifted, the gas line broke, causing the explosion.

4

Aaron Collins also resided in Skyline with his wife, Natasha, their four-year-old daughter, Alexanderia, and Natasha's daughter, Cheslea. They had moved into Skyline about a month before the June 2007 flood occurred. On the night of June 17, a third child, who was Cheslea's friend, stayed in the Collinses' mobile home. According to Natasha, when she went to bed that night, there was nothing to indicate that a flood was going to occur. Eventually, Natasha thought she heard thunder and awoke; she later learned that she had heard the explosion of the Aurells' trailer. By the time Natasha woke up, water was ankle deep in the Collinses' mobile home. Natasha rushed to her daughters' bedrooms, and by the time she got there, the water was knee deep. Natasha stood on a couch with the three children who were in the home and called 911 while Aaron tried to open doors.

Eventually, Aaron opened the back door and found a small boat outside of the mobile home. Everyone in the Collinses' home entered the boat, but the boat capsized when the rushing water caused it to slam into another mobile home. Natasha grabbed the three girls as the water took Aaron downstream. The current eventually ripped Cheslea and her friend from Natasha's arms, but Aaron was able to catch them, and he took them to another mobile home. Another strong current then caused Natasha to lose balance, and she lost her grip of Alexanderia, the four-year-old girl. Aaron tried to catch Alexanderia, but he was not able to. The current slammed Natasha into a tree, where she held on and yelled for help. Aaron dove into the water but was unable to find Alexanderia.

5

Rescuers eventually retrieved Natasha and immediately left again to rescue more people.

Natasha told several firefighters that Alexanderia was missing, and Chief Rhodes sent rescuers to look for her, but they could not find her. When the sun arose and the water receded, Alexanderia's dead body was found in a wooded area that also contained debris that had been carried away by the flood.[4]

The Collinses' and Aurells' homes were located in a floodway.[5] But neither family had been told that their home was in a flood-prone area. Both families have sworn that if they had known of that danger, they would not have moved into Skyline.

The June 2007 flood displaced and damaged several mobile homes within Skyline and sent two homes and a car into the creek. The record indicates that the flood caused more than $1 million in property damage. When the flood occurred, Haltom City was not receiving heavy rain. Chief Rhodes, who had been working for the HCFD since 1986, said that until the June 2007 Skyline

---

[4]Natasha concedes that the emergency responders did all that they could to find Alexanderia.

[5]According to City Engineer Tom Ice, who also serves as the City's floodplain administrator, a floodway is a channel on a water course "that must be reserved in order to discharge a base flood without cumulatively increasing the water surface elevation more than [a] designated height." A floodplain is "land susceptible to being inundated by water." Chief Rhodes described the floodway as "creek level." A City ordinance describes a floodway as an "extremely hazardous area due to the velocity of flood waters."

flood, he had never known flooding to occur in the City when there was no ongoing heavy rain.

Tarrant County declared a local state of disaster. On June 19, 2007, Tarrant County Judge B. Glen Whitley sent a letter to Governor Rick Perry to ask for state assistance in responding to the flood. Officials also asked for and received federal assistance. In part by money that the City received from a federal grant, it eventually began purchasing many Skyline properties that were located in the floodway or floodplain. Also, in 2008, the City cooperated with other cities to create a Hazard Mitigation Action Plan, which broadly addressed potential hazards that could occur in the future. After the flood, Skyline put up signs that warned residents about parts of Skyline being located within a floodplain; the signs cost between $20 and $40 each.

At the time that the flood occurred, the City did not own or maintain any land in or adjacent to Skyline, did not own or control streets in Skyline, did not own or maintain any part of the creek that flows through or is adjacent to Skyline, and did not have any "moveable property" in Skyline.[6] Also, the City did not require residential property owners, including owners of mobile homes, to obtain a permit when moving into a home in the City. Skyline's residents did not pay the City directly for water and sewer service; instead, the City billed Skyline, which

---

[6]The City owned a buried, underground sewer line that ran through part of Skyline, but the sewer line did not affect the flow of surface water in Skyline. The City also owned a part of the creek that was approximately half a mile downstream from Skyline.

7

billed the residents. The City did not furnish electric or gas utility service to Skyline's residents.

Appellees sued the City, Skyline (for negligence and negligence per se), and other parties.[7] Against the City, appellees asserted negligence claims based on special defect and premises defect theories, citing sections 101.021 and 101.022 of the civil practice and remedies code.[8] Appellees also asserted a claim against the City under *Wilson v. Tex. Parks and Wildlife Dep't*,[9] alleging that the City was liable because it had undertaken a duty to make Skyline safe and had breached that duty. Appellees sought damages for their personal physical and emotional injuries, but they did not seek damages relating to their property.

The City answered appellees' suit and filed a motion for summary judgment on traditional and no-evidence grounds.[10] In the motion, the City contended that it had immunity from appellees' claims because it had not

---

[7]Appellees eventually settled their claims against Skyline.

[8]*See* Tex. Civ. Prac. & Rem. Code Ann. §§ 101.021–.022 (West 2011).

[9]8 S.W.3d 634, 635–36 (Tex. 1999).

[10]The City filed a motion for summary judgment rather than a plea to the jurisdiction. That distinction does not affect our jurisdiction over the City's interlocutory appeal. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(8); *Tex. Dep't of Criminal Justice v. Simons*, 140 S.W.3d 338, 349 (Tex. 2004) ("[A]n interlocutory appeal may be taken from a refusal to dismiss for want of jurisdiction whether the jurisdictional argument is presented by plea to the jurisdiction or some other vehicle, such as a motion for summary judgment.").

received timely written or actual notice of them;[11] it did not own, occupy, or control the land where the flooding occurred; it did not breach any duty that might have been owed to appellees when the flood occurred; it had performed discretionary, legislative functions with respect to the enforcement (or lack thereof) or ordinances affecting Skyline; and appellees had no evidence that the City had assumed or breached a duty under *Wilson*. In appellees' response to the City's motion, they dropped their special defect claim and proceeded only upon their premises defect claim and their claim that the City had undertaken a duty to protect Skyline's residents from flooding. The trial court denied the City's motion, and the City brought this appeal.

## Governmental Immunity Generally

Generally, a governmental unit, including a city, enjoys immunity from lawsuits for damages. *See City of Dallas v. Reed*, 258 S.W.3d 620, 622 (Tex. 2008); *Corbin v. City of Keller*, 1 S.W.3d 743, 746 & n.3 (Tex. App.—Fort Worth 1999, pet. denied); *see also Pakdimounivong v. City of Arlington*, 219 S.W.3d 401, 408–09 (Tex. App.—Fort Worth 2006, pet. denied) ("The doctrine of . . . governmental immunity prohibits suits against a governmental entity unless there has been a clear and unambiguous constitutional or statutory waiver of that immunity."). The legislature has provided a narrow waiver of immunity through the Texas Tort Claims Act (TTCA). *Reed*, 258 S.W.3d at 622; *Wise Reg'l Health*

---

[11]*See* Tex. Civ. Prac. & Rem. Code Ann. § 101.101 (West 2011).

9

*Sys. v. Brittain*, 268 S.W.3d 799, 804 (Tex. App.—Fort Worth 2008, no pet.); *Lipan Indep. Sch. Dist. v. Bigler*, 187 S.W.3d 747, 751 (Tex. App.—Fort Worth 2006, pet. denied). A plaintiff's mere reference to the TTCA, however, does not confer jurisdiction on the trial court. *Mogayzel v. Tex. Dep't of Transp.*, 66 S.W.3d 459, 464 (Tex. App.—Fort Worth 2001, pet. denied).

"The requirements that a cause of action must meet in order to come within the TTCA's waiver of governmental immunity are found in section 101.021 of the Act . . . ." *Brittain*, 268 S.W.3d at 805; *see Tex. Dep't of Criminal Justice v. Miller*, 51 S.W.3d 583, 587 (Tex. 2001) (explaining that the "Tort Claims Act does not waive . . . immunity for all negligence claims against governmental units"). Under section 101.021, governmental units are liable for, as is relevant to this case, "personal injury and death so caused by a condition or use of . . . real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." Tex. Civ. Prac. & Rem. Code Ann. § 101.021(2).

An assertion of governmental immunity to suit is a challenge of the trial court's jurisdiction. *Harris Cnty. Hosp. Dist. v. Tomball Reg'l Hosp.*, 283 S.W.3d 838, 842 (Tex. 2009); *State v. Holland*, 221 S.W.3d 639, 642 (Tex. 2007). A motion asserting such immunity involves a question of law that we review de novo. *Harris Cnty. Hosp. Dist.*, 283 S.W.3d at 842. The motion should not be granted if a material fact issue exists concerning the trial court's jurisdiction, but if relevant, undisputed evidence negates jurisdiction, the motion must be granted.

10

*Holland*, 221 S.W.3d at 643. "It is the plaintiff's burden to allege facts that affirmatively establish the trial court's subject matter jurisdiction." *Pakdimounivong*, 219 S.W.3d at 407.

**The City's Immunity from Appellees' Premises Defect Claim**

In part of the City's second issue, it argues that it is immune from appellees' premises defect claim because even if appellees could establish that the City had a duty with respect to the premises at Skyline, appellees did not present evidence that the City breached that duty. Specifically, the City contends that it is immune because the only facts that appellees cite to in an effort to show a breach of duty by the City are "matters which are antecedent to the flood."

"Liability for premises defects is implied under section 101.021(2) because a premises defect arises from a condition existing on real property." *Perez v. City of Dallas*, 180 S.W.3d 906, 910 (Tex. App.—Dallas 2005, no pet.); *see also Dukes v. Philip Johnson/Alan Ritchie Architects, P.C.*, 252 S.W.3d 586, 592 (Tex. App.—Fort Worth 2008, pet. denied) ("Premises liability is a special form of negligence."), *cert. denied*, 555 U.S. 1138 (2009). If a claim "arises from a premise defect, the governmental unit owes to the claimant only the duty that a private person owes to a licensee on private property, unless the claimant pays for the use of the premises." Tex. Civ. Prac. & Rem. Code Ann. § 101.022(a); *see Reyes v. City of Laredo*, 335 S.W.3d 605, 606 (Tex. 2010).

A party that has a duty with respect to a premise defect must "not injure a licensee by willful, wanton, or grossly negligent conduct, and . . . the [party must]

use ordinary care to either warn a licensee of, or make reasonably safe, a dangerous condition of which the owner is aware and the licensee is not." *Corbin*, 1 S.W.3d at 747. To prevail on a premises defect claim under the TTCA, a plaintiff must prove that the condition of the premises created an unreasonable risk of harm, that the governmental unit actually knew of the condition, that the plaintiff did not actually know of the condition, that the governmental unit failed to exercise ordinary care to protect the plaintiff from the dangerous condition, and that the governmental unit's failure to exercise ordinary care proximately caused the plaintiff's injury. *Id.* at 748; *see State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 237 (Tex. 1992) (op. on reh'g).

The City sought summary judgment on the basis that appellees had no evidence that the "City failed to exercise ordinary care to protect [appellees] from [a] dangerous condition." After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense. Tex. R. Civ. P. 166a(i). The motion must specifically state the elements for which there is no evidence. *Id.*; *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact. *See* Tex. R. Civ. P. 166a(i); *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008). When reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the

12

nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006).

In the trial court and on appeal, the City has argued that for appellees to establish a waiver of the City's immunity for their premises defect claim, they must show that the City failed to exercise ordinary care to protect appellees from a dangerous condition and that in this case, the dangerous condition was the flood that occurred in June 2007 and not some condition that existed at Skyline before that date. For this argument, the City relies in part on the supreme court's decision in *Reyes*.

In *Reyes*, Maria Reyes sued the City of Laredo for the wrongful death of her fourteen-year-old daughter, who drowned when the van in which she was riding was swept away by water from an overflowing creek during a rainstorm. 335 S.W.3d at 606. The city asserted governmental immunity, and Reyes argued, in part, that the city was liable under the TTCA for a premise defect. *Id.* The supreme court explained that section 101.022(a) of the TTCA limits the government's duty to prevent injury from premise defects to those of which it has actual knowledge. *Id.* at 606, 608. Under that standard and in light of the evidence that had been presented, the court held that the city was immune from Reyes's suit, explaining that the city

> knew that the crossing had flooded before during heavy rains, but *"the actual knowledge required for liability is of the dangerous condition at the time of the accident, not merely of the possibility that a dangerous condition can develop over time."*

. . . Reyes alleges in her petition that the accident occurred between 3:00 and 3:30 a.m. . . . . Reyes argues that there is evidence the City knew of the flooding as early as 12:30 a.m.

. . . .

. . . [T]he most one can reasonably infer [from a homeowner near the accident site who had called 911 several times about the rising water] about what the City knew is that at 12:30 a.m., Chacon Creek was rising, that "there was going to be a problem" at some point, and that the danger persisted throughout the night. . . . [O]ne cannot infer that the City ever actually knew Century Boulevard had flooded, *or more especially, that it was flooding when the accident occurred*. . . . *Awareness of a potential problem is not actual knowledge of an existing danger.* Had there been testimony that a 911 operator received a credible report at about the time of the accident that the crossing had actually flooded and was imperiling motorists, there would have been evidence the City had actual knowledge of a dangerous condition.

. . . .

. . . The City of Laredo *knew Chacon Creek might flood*, but the record does not show that it *knew the creek had flooded* at the time of the accident. One can certainly argue that as a policy matter, the government should be obliged to do more to protect against dangerous conditions . . . . But that choice belongs to the Legislature.

*Id.* at 608–09 (emphasis added) (citations omitted).

More than a decade before deciding *Reyes*, the supreme court considered

whether a city could be liable for injuries that a plaintiff received at a city-owned

recreation center by slipping on water while playing basketball. *See City of San

Antonio v. Rodriguez*, 931 S.W.2d 535, 536 (Tex. 1996). In explaining what the

relevant "dangerous condition" was in the suit, the court stated,

The water on the floor of the basketball court came from a leak in the roof. The evidence is undisputed that the City knew of

14

the leaks in the roof, but the City disputed whether it knew of the water on the floor at the time Rodriguez slipped. The court of appeals held that the jury could have concluded that the leaky roof was the dangerous condition in the premises, so that the City's knowledge of the dangerous condition was conclusively established. We disagree. *The leaky roof was not itself a dangerous condition; it could only cause a dangerous condition. The City was not required to warn of leaks in the roof or repair them; it was required only to prevent the water that leaked through the roof from causing a dangerous condition.* On retrial, the jury should be instructed that the allegedly dangerous condition was the water Rodriguez claims was on the floor.

*Id.* at 536–37 (emphasis added) (citation omitted).

Between deciding *Rodriguez* and *Reyes*, the supreme court considered whether the City of Dallas could be liable for a premise defect when a plaintiff injured herself by tripping on a metal coverplate in an airport. *See City of Dallas v. Thompson*, 210 S.W.3d 601, 602 (Tex. 2006). After stating that the city was immune unless "there [was] evidence that it actually knew of the alleged protruding coverplate," the court determined that Thompson had presented no such evidence. *Id.* at 602–03. The court explained,

The lobby area in which Thompson fell was well-traveled, and passengers and City employees walked through the area daily, including the day of the fall. In the hours prior to Thompson's fall, City employees had been in the area of the coverplate and probably had walked over it, but no one reported or observed the coverplate protruding from the floor. Accident logs reflected reports of tripping where Thompson did, but none for at least three years. The City knew that the coverplate could become loose and raise suddenly or over time with ordinary wear and tear, and when it did, City employees would tighten it. . . .

Thompson argues that the fact that the coverplate could loosen and protrude over time made the coverplate itself, actually protruding or not, a dangerous condition, and the City's knowledge

15

of this periodic protrusion and the need for inspection and maintenance satisfied the requirement of actual knowledge. But we have held that the fact that materials . . . *may become dangerous does not itself create a dangerous condition, and the actual knowledge required for liability is of the dangerous condition at the time of the accident, not merely of the possibility that a dangerous condition can develop over time. CMH Homes, Inc. v. Daenen*, 15 S.W.3d 97, 100–02 (Tex. 2000) (holding that the defendant's knowledge that its stair and platform units periodically became unstable was not evidence the units were unreasonably dangerous, nor evidence of actual or constructive knowledge that a unit had become dangerous when plaintiff was injured); *see also State v. Gonzalez*, 82 S.W.3d 322, 330 (Tex. 2002) (holding that evidence that the State "knew the [traffic] signs had been repeatedly vandalized does not indicate, either directly or by reasonable inference, that [it] actually knew the signs were down before the accident occurred").

Thompson argues that the City's knowledge of past reports of tripping was sufficient. But the reports were all far too remote to show *that the City knew of a dangerous condition at the time Thompson fell.*

*Id.* at 603 (emphasis added).

Finally, four years ago, in a premises liability case with facts that are analogous to the evidence in this appeal, the supreme court determined whether the City of Corsicana could be liable for the drowning deaths of two children. *See City of Corsicana v. Stewart*, 249 S.W.3d 412, 413 (Tex. 2008). In *Stewart*, Stewart's car stalled while he attempted to cross a low-water crossing. *Id.* When he left his children in the car and went away to seek help, the water swept the car away, and the children drowned. *Id.* The issue before the supreme court was whether Stewart had presented evidence that created a genuine factual dispute

16

regarding the city's actual knowledge of a dangerous condition. *Id.* The court

held that the he had not done so, stating,

> The court of appeals held that in this case, actual knowledge could be inferred from circumstantial evidence including: (1) testimony . . . that the crossing "sometimes" flooded during heavy rains, that the crossing was designed to allow water to flow over it during heavy rains, and that the City closed the crossing on several prior occasions due to flooding; (2) a study commissioned by the City several years prior to the accident identifying the crossing as vulnerable to future flooding; (3) a former City Council member's testimony that she informed City personnel of "dangerous conditions" at the crossing during "light and heavy rains"; (4) the National Weather Service's issuance of four pertinent severe weather warnings on the afternoon and night preceding the accident; [and] (5) evidence that the Texas Department of Transportation (TxDOT) closed a road one mile upstream from the crossing several hours prior to the accident due to flooding . . . .

> . . . In addition to the evidence relied on by the court of appeals, Plaintiffs point to statements in the responding officer's report at the evidentiary hearing that the rain was intense as he drove to assist Stewart, that local dispatch was inundated with calls for help from stranded motorists and flooded homeowners, and that many officers could not reach those in need due to high water. Plaintiffs further argue that according to City procedures, City officials are supposed to monitor areas likely to flood when flooding is anticipated.

> It is undisputed that no direct evidence was offered that the City knew the crossing was flooded prior to the accident. Actual knowledge requires knowledge that the dangerous condition existed at the time of the accident, as opposed to constructive knowledge which can be established by facts or inferences that a dangerous condition could develop over time. Here, the Legislature required that the City actually know that the crossing was flooded at the time of the accident. . . .

> . . . [T]he evidence presented in this case does not reasonably support the inference that the City actually knew the crossing was flooded on the night of the accident. Plaintiffs' evidence indicates that there was inclement weather in the vicinity of

Corsicana on the night of the accident, that a road one mile upstream was closed due to flooding, *that the City knew the crossing tended to flood during heavy rains*, and that the City was aware of heavy rains and flooding after the accident occurred. *Neither this evidence nor the inferences arising therefrom raise a fact question on the City's actual knowledge that a dangerous condition existed at or near the crossing at the time of the accident.*

*Id.* at 414–15 (emphasis added) (citation omitted).

The evident theme from these four supreme court decisions is that for a governmental entity's duty to arise in a premises liability case, the entity must have actual knowledge of the existing danger that causes the plaintiff's injury, and mere knowledge of an antecedent condition that could have potentially caused a dangerous condition at a later time is insufficient to waive the entity's immunity. Courts of appeals, including our own court, have applied this principle in several cases. For example, in *City of Austin v. Leggett*, Trudy Leggett, whose son had drowned after attempting to drive through a flooded street, sued the city under a premises liability theory, alleging that the city had negligently maintained or had negligently designed a stormwater detention pond. 257 S.W.3d 456, 460 (Tex. App.—Austin 2008, pet. denied). Leggett argued that the "dangerous condition" in the case was the pond (and a defective drainage grate) rather than the flooding itself. *Id.* at 469. The Austin Court of Appeals disagreed, stating that the "relevant 'dangerous condition' for purposes of premises liability [was] not the condition of the pond or grate, but the flooding in the location where Nathan drowned." *Id.* at 470. Citing *Rodriguez*, among other cases, the court explained,

18

The supreme court has repeatedly held that the relevant unreasonably dangerous condition in a premise liability case is generally the condition at the time and place injury occurs, not some antecedent condition or situation that helps create a dangerous condition.

. . . .

. . . [W]e agree with the City that the unreasonably dangerous condition that is the proper focus of Leggett's premises claim is the flooding in the intersection where Nathan drowned, not the allegedly defective grate or other antecedent condition related to Pond 342 that Leggett claims contributed to the flooding. In other words, any duty of the City here could arise only from its knowledge of the flooding in the intersection, not merely its knowledge regarding the grate or other condition of the pond condition, *and such duty would be to warn or make reasonably safe the flooded area rather than anything in the pond.* To the extent that Leggett purports to assert a claim predicated upon an "unreasonably dangerous condition" in the pond, as opposed to the flooding where Nathan drowned, we hold that it is barred by governmental immunity.

*Id.* at 470–71 (citations omitted); *see also City of San Antonio v. Tex. Mut. Ins. Co.*, No. 04-07-00837-CV, 2009 WL 89700, at *3 (Tex. App.—San Antonio Jan. 14, 2009, no pet.) (mem. op.) (rendering a judgment dismissing claims against a city because while "the City may have been warned that a . . . sinkhole was likely, that did not constitute actual knowledge of the dangerous condition. The law clearly requires the sinkhole to have developed and the City to be aware of its existence."); *Biermeret v. Univ. of Tex. Sys.*, No. 02-06-00240-CV, 2007 WL 2285482, at *5–6 (Tex. App.—Fort Worth Aug. 9, 2007, pet. denied) (mem. op.) (concluding that a university was immune from the plaintiff's premises liability claim because the plaintiff was required to present evidence of the university's knowledge "not just that the tile floor in the shower area was prone to become

19

wet and slick, but that on the date in question it actually had become wet and slick prior to [the plaintiff's] fall").

Citing *Reyes* and *Stewart*, among other cases, the City contends that the "relevant dangerous condition is the floodwater" and that the City's knowledge that Skyline "could be subject to flooding . . . is not the relevant inquiry." Appellees concede in their brief that under the rationale expressed in *Reyes* and the other cases cited above, the City's duty "to warn or make safe would not arise until the [C]ity knows it is actually flooding." Appellees acknowledge that under *Reyes*, "it is not the threat or possibility of a flood that triggers a duty to warn or make the flooded area safe. It is only the actual flooding . . . that triggers the duty."

Appellees have accurately stated the rule that the supreme court applied in each of the *Reyes*-like cases. That rule creates a problem for appellees because, as the City argues, the only facts that appellees cite to in an effort to show that the City breached a duty are matters that occurred before the night of the June 2007 flood. Specifically, in the section of appellees' summary judgment response in which they detailed the duties that they believed the City breached, they stated that the City had failed to eliminate the flooding danger prior to June 2007 and that the City had failed to warn them that they were living in a floodway prior to June 2007. Under the cases cited above, neither of these facts can waive the City's immunity under a premises defect theory because they occurred when the City had knowledge of conditions in Skyline that could later create a

dangerous condition rather than occurring after the City had actual knowledge of the relevant dangerous condition, which was the June 2007 flood. Appellees conceded in the trial court that they were not complaining about any conduct by the City on the night of the flood. They also stated in an interrogatory response that they were not complaining about police officers, firemen, and other emergency personnel who engaged in rescue efforts or responded to 911 calls.

Appellees do not contend that the City has misinterpreted the holding in *Reyes*; rather, appellees contend that applying *Reyes* to the facts of this appeal "simply makes no sense" because doing so would impose a more difficult duty upon cities to respond to flooding itself rather than reducing the danger of future flooding, and because when it is flooding, it is too late to take simple measures like posting warning signs about homes being located within a floodplain, which an entity has ample time to do when it is not flooding. Thus, appellees ask us to "impose" duties upon the City that are greater than the duties required by *Reyes* and the other cases cited above. But in the section of their brief where they discuss *Reyes*, appellees have not cited any cases, from the supreme court or otherwise, that distinguish the holdings in *Reyes*-like cases while imposing a different rule. Also, any consideration of how much sense the supreme court's precedent makes to us is immaterial to our obligation to follow it. *See Lubbock Cnty., Tex. v. Trammel's Lubbock Bail Bonds*, 80 S.W.3d 580, 585 (Tex. 2002) ("It is not the function of a court of appeals to abrogate or modify established

21

precedent."); *Grapevine Excavation, Inc. v. Maryland Lloyds*, 35 S.W.3d 1, 5 (Tex. 2000) ("Adhering to precedent fosters efficiency, fairness, and legitimacy.").

We determine that appellees did not present more than a scintilla of evidence establishing an essential element of their premises defect claim: that the City failed to exercise ordinary care after receiving actual knowledge of the relevant dangerous condition, which was the June 2007 flood.[12]  *See Reyes*, 335 S.W.3d at 608–09; *Stewart*, 249 S.W.3d at 414–15; *Corbin*, 1 S.W.3d at 747. Thus, we hold that the trial court erred by denying the City's no-evidence motion for summary judgment with respect to that claim.  *See* Tex. R. Civ. P. 166a(i); *Hamilton*, 249 S.W.3d at 426.  We sustain the City's second issue to that extent.

### The City's Immunity from Appellees' Claim under *Wilson*

Appellees argue that the "acts and omissions of Haltom City about which [they] complain arose from the negligent implementation of policies" concerning warning the public about Skyline's flooding danger, buying out properties in Skyline that were in danger of flooding, and taking other actions "before the June 18, 2007 flood hit Skyline."  In other words, appellees argue that the City undertook a responsibility to provide notice and protection to Skyline residents concerning the potential for flooding there and that the City was negligent with

---

[12]We recognize that the *Reyes*-like holdings make it difficult to satisfy the elements of a premises liability claim in cases with facts similar to those in this case.  Nonetheless, we are obligated to follow the precedent of our supreme court.  *See Smith v. Kelly-Moore Paint Co., Inc.*, 307 S.W.3d 829, 834 (Tex. App.—Fort Worth 2010, no pet.).

respect to completing that undertaking. *See Dukes*, 252 S.W.3d at 598 (explaining that a negligent undertaking theory rests on a plaintiff's allegations that the defendant undertook to perform services that it knew or should have known were necessary for the plaintiff's protection and that the defendant failed to exercise reasonable care in performing those services).[13] Although the cases cited below indicate that the City's immunity could be waived by section 101.021 through a negligent undertaking theory under proper facts, appellees did not present evidence that raises genuine issues of material fact on essential elements of the theory.

Appellees argue that in *Wilson*,

> the Texas Supreme Court held . . . that a government entity that undertakes a duty to protect persons from the flooding of a river may have liability if the river floods and causes death or injury . . . . Haltom City undertook such a duty in this case, utterly failed in that duty[,] and bears legal responsibility for [what] happened to the Collins and Aurell families.

The City sought summary judgment on the grounds that there was no evidence that the City owed or breached a duty under *Wilson*. The City argues that *Wilson* does not apply to this case because, in part, in *Wilson*, there was evidence that

---

[13]Appellees did not expressly raise a "negligent undertaking" claim in their pleading, but they pled that the City was negligent under *Wilson* separately from being negligent under a premises defect theory. The issue of the application of *Wilson*, which concerns negligent undertaking principles, was litigated in the trial court through the City's summary judgment motion and through appellees' response, in which appellees stated that their claim under *Wilson* was in "addition to their traditional premises liability claim." We will therefore analyze whether negligent undertaking principles could have imposed a duty on the City beyond the duty that typically arises in premises liability claims.

23

the plaintiffs relied on the defendant's undertaking, while there is no similar evidence of reliance here.

In *Wilson*, two brothers had drowned in a river. 8 S.W.3d at 635. The river was owned by the State of Texas, but the brothers' beneficiaries sued the Texas Parks and Wildlife Department (the Department), which owned a park that adjoined the river. *Id.* There was no evidence that the Department controlled the river, but there was evidence that

> the Department had the authority to restrict visitors' use of the river in certain areas, and that it had established a "flood early warning system" in response to prior drowning deaths that had occurred on the river. The Department put up signs around the park notifying visitors that they should leave the river area immediately whenever they heard the flood warning sirens, and put similar warnings on maps and other park literature. The flood early warning system was not functioning properly on the day of the accident and so the siren did not go off to warn the Wilsons that the river was flooding.
>
> . . . .
>
> . . . Plaintiffs allege that the Department was negligent, not in preventing the river from flooding, *but in failing to provide visitors with adequate warning of the impending flood.* Plaintiffs contend that by putting up signs about its flood warning systems, *the Department encouraged visitors' reliance that the park rangers were monitoring the river and would provide adequate warning if dangerous conditions developed.*

*Id.* at 635–36 (emphasis added). With that factual background, the supreme court remanded the case to the trial court under the rationale that a party may owe a "duty of due care if it undertakes to make the premises safe for others." *Id.* at 635. As authority for this proposition, in footnote four of its opinion, the

24

supreme court quoted section 323 of the Restatement (Second) of Torts, which states,

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323 (1965); *see Wilson*, 8 S.W.3d at 635 n.4. The supreme court's citation and application of this section in *Wilson* makes sense because, as the court explained, the plaintiffs had contended that the Department's signs encouraged the brothers' reliance on the Department to warn them of danger.[14] *See Wilson*, 8 S.W.3d at 635 n.4, 636.

Along with citing section 323 of the Restatement in footnote four of its opinion in *Wilson*, the supreme court also cited three of its cases, including *Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116, 117 (Tex. 1976). In *Taylor*, a plaintiff had alleged that a mortgage company had gratuitously assumed responsibility for insuring a house against fire by sending a letter stating that the property was insured. *Id.* at 119. The court in that case quoted section 323 to

---

[14]The City argues that *Wilson* is distinguishable from this case because unlike the Department in *Wilson*, the City "never installed or required the type of warning signs which were central to the possibility that a duty was assumed."

25

hold that although there was no evidence that the mortgage company increased a risk of harm, there was a disputed fact issue about whether the mortgage company had assumed responsibility to insure the house because Taylor had relied on the company's letter. *Id.* at 119–20. The other two cases that the supreme court cited in footnote four of *Wilson*, for support of its statement that a defendant may owe a duty of care if it undertakes to make a premises safe for others, were *Lefmark Mgmt. Co. v. Old*, 946 S.W.2d 52, 54 (Tex. 1997) and *City of Denton v. Page*, 701 S.W.2d 831, 835 (Tex. 1986). In both of those cases, to support statements that a defendant may owe a duty to make premises safe, the supreme court cited a case from the Beaumont court of civil appeals in which that court held that the plaintiff's reliance on a defendant's promise to remove slippery algae created a duty upon the defendant to do so. *See Old*, 946 S.W.2d at 54 (citing *Gundolf v. Massman-Johnson*, 473 S.W.2d 70, 71–75 (Tex. Civ. App.—Beaumont 1971), *writ ref'd n.r.e.*, 484 S.W.2d 555 (Tex. 1972)); *Page*, 701 S.W.2d at 835 (citing *Gundolf*).

Many cases concerning premises defects and other types of negligence support the supreme court's statement in *Wilson* (through the court's quotation of section 323 of the Restatement) that for a duty to arise upon a defendant through a voluntary undertaking, the defendant must have increased the plaintiff's risk of harm or the plaintiff must have relied on the defendant's undertaking to make the premises safe. For example, in *Torrington Co. v. Stutzman*, a case in which the plaintiffs relied on an undertaking theory to argue that the defendant had a duty

with respect to the plaintiffs' negligence and products liability claims, the supreme court examined the propriety of a jury charge that omitted the increased-risk-of-harm or reliance requirements. 46 S.W.3d 829, 837 (Tex. 2000).[15] In holding that the jury charge was erroneous, the court, relying in part on section 323, stated,

> The [broad-form negligence] question . . . allowed an affirmative answer regardless of whether anyone relied upon Torrington's undertaking, or whether Torrington's performance of its undertaking increased the plaintiffs' risk of harm. Because the question allowed the jury to find Torrington liable even if the plaintiffs did not establish the necessary factual predicates for a negligent undertaking duty, it was erroneous. *These essential elements of an undertaking claim should be included in the instructions accompanying a broad-form negligence question.* Thus, the jury should have been instructed that Torrington was negligent only if (1) Torrington undertook to perform services that it knew or should have known were necessary for the plaintiffs' protection, (2) Torrington failed to exercise reasonable care in performing those services, *and either (3) the Navy relied upon Torrington's performance, or (4) Torrington's performance increased the plaintiffs' risk of harm.*

*Id.* at 838 (citations omitted). In a footnote, the supreme court added, "We have never held that a person may be liable on an undertaking theory without establishing reliance or increased risk of harm, and we decline to do so now." *Id.* at 838 n.7.

More than twenty years ago, the supreme court decided another case in which the court, under the context of the TTCA, considered whether a defendant

---

[15]The supreme court has equated the undertaking theory presented in *Stutzman* with the one discussed in *Wilson*. *See id.* at 841; *City of Waco v. Kirwan*, 298 S.W.3d 618, 627 (Tex. 2009) (citing *Stutzman* and *Wilson* together while discussing negligent undertaking claims).

had voluntarily undertaken a duty with regard to a plaintiff's negligence claim. *See Fort Bend Cnty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 395–96 (Tex. 1991). In *Sbrusch*, a drainage district obtained an easement across privately-owned land to construct a drainage channel. *Id.* at 393. In exchange for obtaining the easement, the district agreed to repair all damage to roads and passageways resulting from the district's use of the easement and from the district's traveling to and from the easement. *Id.* In March 1981, someone informed the district that a bridge was unsafe, and one of the district's employees said that the district would "take care of it." *Id.* at 394. In December of that year, however, the bridge had not been repaired, and as Sbrusch attempted to cross the bridge, it collapsed. *Id.* Sbrusch sued the district and Fort Bend County, alleging negligence in failing to repair the bridge and in failing to warn the public of its dangerous condition. *Id.* Although a jury awarded damages to Sbrusch, the supreme court concluded that the district did not have a duty to Sbrusch to repair the bridge, stating in part,

> A future obligation based on past conduct will arise if the first undertaking has increased a risk of harm, thereby requiring additional action to protect third persons, or if the actor makes an express promise that future assistance will be forthcoming, and the injured party relies to his detriment on that promise and the past conduct. In the present case, there is no evidence the District's past repairs *increased* the risk of harm to Sbrusch. Furthermore, while certain statements were made . . . indicating that future assistance would be forthcoming, there is no evidence that Sbrusch knew of this "promise" . . . . Without any knowledge that the District had undertaken to perform further repairs on this bridge, Sbrusch was not entitled to detrimentally rely on the District to perform the needed repair based solely on its past conduct.

28

*Id.* at 394, 397–98.

Like the supreme court, courts of appeals, including our own court, have also noted that for a duty to arise on a voluntary undertaking theory, the plaintiff must prove an increased risk of harm or reliance. *See, e.g.*, *Dukes*, 252 S.W.3d at 597–99 (citing section 323 and *Stutzman* in a premises liability case while explaining that the plaintiff had failed to show reliance or an increased risk of harm to establish that a duty arose as a result of a voluntary undertaking); *Tex. Woman's Univ. v. The Methodist Hosp.*, 221 S.W.3d 267, 284 (Tex. App.— Houston [1st Dist.] 2006, no pet.); *Johnson v. Brown Cnty.*, No. 11-00-00331-CV, 2001 WL 34373595, at *3 (Tex. App.—Eastland Sept. 6, 2001, no pet.) (not designated for publication) (holding that a county had no duty to mow tall grass and weeds that obscured a driver's view to an intersection under a voluntary undertaking theory because (1) the county's mowing the grass and weeds on prior occasions did not increase the plaintiff's risk of harm, and (2) the plaintiff did not show reliance).

Appellees argue that the City had a duty with respect to the premises at Skyline under *Wilson* because, among other reasons,

- the City was aware of many instances of prior flooding in Skyline;

- the City sought to protect residents of Skyline from the flooding;

- the City exercised control over the creeks and waterways within its city limits; and

- the City had the authority to restrict the placement of mobile homes in flood-prone areas.

The summary judgment evidence establishes the following facts. In 1987, the City enacted an ordinance to prevent flood damage. In 1990, the City issued a memorandum stating that it had met with representatives of the Federal Emergency Management Agency (FEMA) concerning the "Skyline Mobile Home Park floodway issue." The memo noted that Skyline had "[p]rivate streets, water, and sanitary sewer lines," and it stated, in part, "FEMA is of the opinion that it is the [City's] responsibility to notify property owners that they are in a floodplain . . . ." The City also sent a letter to Skyline's residents in 1990 that stated in part,

> Recently, public attention has been drawn to the location of a portion of the Skyline Park being located in the Whites Branch Creek floodway. We are writing to make you aware that your lot is located in a floodway area as designated by [FEMA].
>
> . . . .
>
> . . . A small portion of the mobile home park (+50 lots) is located in what is called the "floodway" . . . .
>
> . . . The mobile homes within the floodway of Skyline . . . have flooded at least four times in the past – 1981, twice in 1988, and twice in 1989.

Also in 1990, the City sent a letter to Skyline that asked Skyline to make existing and future residents aware that they were living in a floodway; City Manager Tom Muir testified in his deposition that he was not aware of any letters that the City sent to Skyline residents after 1990 to notify them of the danger of flooding.

In 1991, Philip Patterson, the City's floodplain administrator at that time, wrote a letter to FEMA recognizing that Skyline had properties within the floodway and floodplain but stating that those properties would be allowed to remain there because they had been platted and sold prior to the completion of a flood insurance rate map. The letter stated, however, that the City intended to "initiate a proactive public notification process in the park regarding the floodway issue."

Years before the June 2007 flood, the City amended chapter thirty-eight of its code of ordinances. The City expressed that some of the purposes of chapter thirty-eight were to promote safety, protect human life and health, minimize public and private losses caused by flood conditions, minimize the need for rescue and relief efforts associated with flooding, and ensure that potential property buyers would be notified that the property was in a flood area. According to Muir, FEMA requires local governments to adopt flood prevention requirements for the governments' residents to be eligible for flood insurance through a national program. Ice's affidavit states that chapter thirty-eight was adopted in accordance with the requirements for the national flood insurance program.

Some of the language in chapter thirty-eight had been contained in the 1987 ordinance. A section of chapter thirty-eight, titled "Flood Mitigation Plan," recites,

> The city is impacted primarily by two streams that traverse the city. Big Fossil Creek generally runs along the eastern part of the city, while Little Fossil Creek traverses the southwest corner of the

31

city. Most significant flooding problems are associated with these streams and their tributaries. . . .

        One of the most significant flooding problems within the city involves flooding of mobile homes in [Skyline] . . . on [Whites] Branch, a tributary of Big Fossil Creek in the northern part of the city.

Another section stated,

        Significant flooding in the city occurs primarily along the major streams, specifically in two locations.

    . . . .

        The second major area of flooding occurs along [Whites] Branch, a tributary of Big Fossil Creek . . . in northern Haltom City. A large portion of [Skyline] is inundated by the 100-year rain event. A number of mobile homes are located within the floodplain, and several are situated in the actual floodway. . . . Flooding has been frequent enough in the mobile home park that fire department personnel monitor the area when moderate to heavy rainfall occurs. On several occasions, rescues have been necessary to remove residents from the mobile homes as floodwaters rise. . . . These rescues have been made in dump trucks, which are heavy enough to avoid being swept away, as well as small boats. In addition to endangering the citizens, the rescuers themselves are also endangered by the high water.

Yet another section stated,

        Because of the hazard in [Skyline] described previously to property, citizens and emergency response personnel, and because of the likelihood of recurring problems in this area, it is likely that the most cost effective solution is for the city to purchase the lots subject to flooding in order to completely eliminate the threat of flood damage. Clearly, the hazard to the residents of [Skyline], as well as to emergency response personnel, renders a "no action" alternative unacceptable.

As part of the City's desire to reduce the risks associated with flooding, the

City expressed within chapter thirty-eight that it would implement an "action plan"

that included developing a public education program to encourage citizens to buy

32

insurance and to notify them if they lived in a flood-prone area; applying for a federal grant for the purchase of high-risk properties; and purchasing the high-risk properties, including, potentially, "133 lots in the Skyline Mobile Home Park . . . within the 100-year floodplain, of which 27 are in the regulatory floodway." Chapter thirty-eight also stated that no structure could be "located, altered, or have its use changed without full compliance with the terms of th[e] chapter"; that the city manager would be responsible for implementing chapter thirty-eight's provisions; that manufactured homes were required to be elevated and anchored to resist flotation, collapse, and lateral movement; and that manufactured homes could not be "placed in areas which ha[d] been identified as regulatory floodways."

In April 2002, FEMA approved the City's flood mitigation plan and stated that the City was eligible to apply for grants. But in more than five years between then and June 2007, the City did not apply for such grants.

Chief Rhodes said that he had limited knowledge of the flood mitigation plan, had not studied it, and was not involved in implementing it. During his deposition, Chief Rhodes did not know who the City's floodplain administrator was, and he said that prior to the June 2007 Skyline flood, he had never interacted with Muir about flooding issues in Skyline.

During Muir's deposition, he expressed that he did not know who the City's floodplain administrator was or what a floodplain administrator did. He also testified that he was "not real familiar" with the City's flood mitigation plan

33

because he had not read it and that he did not know who should have administered the plan. From 2002 until June 2007, Muir did not have meetings with anyone in the City's public works department concerning flood mitigation issues. Muir recognized, however, that as the city manager, he was responsible to see that the City's ordinances were carried out, and he was therefore responsible to assign someone to implement the flood mitigation plan. Muir testified in his deposition that he first learned about the possibility of the City's purchasing lots in Skyline after the June 2007 flood.

David Fain, the City's director of public works, oversees the City's floodplain administrator, but like Muir, during Fain's deposition, he was unfamiliar with the flood mitigation plan. Before June 2007, Fain had never been asked to address the flooding issue in Skyline.

The City enacted a storm water fee in 2004 and therefore started adding a charge to residents' monthly water bills. In each of the 2004/2005, 2005/2006, and 2006/2007 fiscal years, the fee generated more than $1 million in revenue. Although the fee had been mentioned in chapter thirty-eight as a source of funding for taking the actions described in the plan, including acquiring flood-prone properties, the City did not use any of the money for buying out Skyline's properties; rather, the City spent the money to clean creeks, hire personnel to maintain the City's drainage infrastructure, and purchase equipment for drainage maintenance.

In his deposition, Perry Bynum said that as the City's emergency management coordinator, he is responsible for seeking and managing grants. Bynum testified in his deposition, however, that he had never read the flood mitigation action plan. He also said that he did not know that the drainage utility fee could be used for flood mitigation. Although Bynum knew before June 2007 of the possibility that mobile homes in Skyline could be bought out, the City did not buy out any mobile homes before that time.[16]

In his affidavit, Muir said that although the City had recognized in chapter thirty-eight that it could purchase flood-prone properties, he was not aware of a legal requirement that would have compelled the City to do so. Muir also said that he was not aware of any law that mandated any specific actions for flood mitigation, including educating residents, making structural improvements, or monitoring flooding. Chief Rhodes and Bynum said the same thing in their affidavits. Bynum explained, "[T]here are no specific requirements or laws or ordinances as to the schedule for when purchases of Skyline properties would be carried out . . . ." He also noted that chapter thirty-eight, which expressed the City's concerns about flooding in Skyline, was a public record that could have been accessed by the City's residents. Finally, he explained, "Prior to the

---

[16]After the June 2007 flood, the City obtained $1.47 million from FEMA. In 2009, with the FEMA grant and its own money, the City began purchasing dozens of properties. The City was able to remove several homes in Skyline from the floodway; as of February 22, 2011, the City had entered contracts on sixty lots and had closed transactions on forty-six lots. Muir said in his deposition that the City could have purchased the lots without the FEMA grant.

flood . . . in Skyline . . . , Haltom City . . . had not made any specific commitment to take any specific steps to protect the residents of Skyline from flood events." Concerning the City's flood mitigation plan, Fain said, "[A] plan is exactly that, it's . . . a guide to assist in making decisions.  It doesn't mean it's . . . a plan that has to be implemented, unless it's directed by our decision maker to say you will administer this plan verbatim."

Months before the June 2007 flood, in the course of preparing a hazard mitigation action plan, Bynum created a document that stated in part,

> The probability for flooding to occur within Haltom City is high due to the various [floodplains] that run through our city.  Flash flooding can and does occur regularly when there is a rain cell that is either over our city or even [upstream] from our city.  The creeks that run through Haltom City can easily be overwhelmed from as little as two to three inches of rain falling over a short period of time.
>
> . . . .
>
> Residential housing in Haltom City has been exposed to flooding and [its] after effects.  The homes that are in and around the floodplain are obviously at risk, but the majority of the time those individuals have little or no way to flood proof their home.
>
> . . . .
>
> Haltom City would propose to buy out and move over 200 manufactured homes to reduce the exposure to annual flooding of this manufactured home community.
>
> . . . .
>
> The benefit [of buying out the manufactured homes] would be [immense] in numerous ways from reducing the possibility of loss of life to not only the owner of the property but also to the first responder who is risking life and limb to save the flood victim. . . . I think we have seen the effects of not moving fast enough to mitigate a hazard before there is a loss of life.

36

This evidence, along with the remaining summary judgment evidence presented by appellees, might raise a genuine issue of material fact on two elements of a negligent undertaking claim under *Wilson*: that the City undertook a duty to perform services that it knew or should have known were necessary for appellees' protection and that the City failed to exercise reasonable care in performing those services. *See Wilson*, 8 S.W.3d at 635 n.4; *Dukes*, 252 S.W.3d at 598. The facts, however, do not comprise any evidence of the other "essential elements" of a negligent undertaking claim: that appellees relied on the City's undertaking or that the City's undertaking increased appellees' risk of harm. *See Dukes*, 252 S.W.3d at 603 (holding that the plaintiff's attempt to impose a duty through a voluntary undertaking theory "necessarily" failed because the plaintiff did not present evidence creating a genuine issue of material fact on reliance or increased harm); *see also Stutzman*, 46 S.W.3d at 838 (referring to reliance or increased risk of harm as "essential elements" of an undertaking claim); *Guadalupe-Blanco River Auth. v. Pitonyak*, 84 S.W.3d 326, 342 (Tex. App.—Corpus Christi 2002, no pet.) (explaining that an entity's negligent implementation of a policy does not itself waive immunity and that a plaintiff must still establish a waiver of immunity under 101.021).

Appellees' summary judgment evidence negates the possibility that they relied on the City to address Skyline's flooding issue; rather, it demonstrates that they did not even know of a potential for flooding. In his affidavit, Aaron Collins said,

When the June 18, 2007 flood hit, my wife and I did not know and were not told by anyone that the mobile home we leased was located in a floodway, a floodplain[,] or in a dangerous [flood prone] area. We did not learn that information until after the . . . flood. On June 18, 2007, we did not know and were not told by anyone that that prior to the time we moved into Skyline, there had been numerous significant floods in the area of the park where we lived, and that during several of these past floods, Skyline residents had to be rescued from floodwaters by emergency personnel.

Natasha Collins, Jacki Chantell Sexton-Aurell, and Brian Aurell made similar statements. Appellees state in their brief that they were "unaware that the mobile homes they leased were sitting in a floodway" because "they had never been so warned by Haltom City or anyone else."

Also, appellees did not present evidence of an increased risk of harm caused by the City's undertaking. While the summary judgment evidence may raise a genuine issue of material fact on whether the City failed to exercise reasonable care to lessen the known danger in Skyline, the evidence does not raise a fact issue that the danger of flooding at Skyline generally, or the danger to appellees specifically, was worse because of the City's actions than if the City had never recognized the danger and had never expressed an intention to remedy it. The evidence does not establish, for example, that someone else would have warned appellees about Skyline's flooding danger or would have abated that danger but for the City's undertaking to do so.

For these reasons, based on the undisputed facts recited above, we conclude that appellees failed to present evidence that creates a genuine issue of material fact on essential elements of their negligent undertaking claim, under

*Wilson*, against the City, and that the trial court erred by denying the City's no-evidence motion for summary judgment with respect to that claim. *See* Tex. R. Civ. P. 166a(i); *Hamilton*, 249 S.W.3d at 426; *Stutzman*, 46 S.W.3d at 838; *Wilson*, 8 S.W.3d at 635 n.4, 636. We therefore also sustain that part of the City's second issue.[17]

## Conclusion

Having sustained the City's second issue, we reverse the trial court's order denying the City's motion for summary judgment, and we render a judgment dismissing appellees' suit against the City with prejudice.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and GABRIEL, JJ.

DAUPHINOT, J., filed a dissenting opinion.

DELIVERED: August 23, 2012

---

[17]Because our decision to sustain the City's second issue is dispositive, we decline to address the City's other four issues, in which they contend that the trial court should have also granted summary judgment for other reasons. *See* Tex. R. App. P. 47.1; *Binzer v. Alvey*, 359 S.W.3d 364, 367 (Tex. App.—Fort Worth 2012, pet. denied).



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 02-11-00197-CV

CITY OF HALTOM CITY                                              APPELLANT

V.

BRIAN AURELL, INDIVIDUALLY                                      APPELLEES
AND AS NEXT FRIEND OF
RANGER HUNTER AURELL, A
MINOR; JACKI CHANTELL
SEXTON-AURELL, INDIVIDUALLY;
AARON COLLINS, INDIVIDUALLY
AND AS REPRESENTATIVE OF
THE ESTATE OF ALEXANDERIA
COLLINS; AND NATASHA
COLLINS, INDIVIDUALLY AND AS
REPRESENTATIVE OF THE
ESTATE OF ALEXANDERIA
COLLINS AND AS NEXT FRIEND
OF CHESLEA MCMASTER

----------

## FROM THE 48TH DISTRICT COURT OF TARRANT COUNTY

----------

## DISSENTING OPINION

----------

Appellant City of Haltom City argued below only that there was no waiver of sovereign immunity. Because I believe the summary judgment evidence supports the trial court's decision and that justice would be best served in this case by allowing Appellees a trial on the merits, I respectfully dissent from the majority opinion reversing the sound decision of the trial court.

LEE ANN DAUPHINOT
JUSTICE

DELIVERED: August 23, 2012