

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-12-00187-CV

THE STRICKLAND GROUP, INC.                                    APPELLANT

V.

PATHFINDER EXPLORATION, LLC                                    APPELLEES
AND JERRY WILSON

----------

## FROM THE 348TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

This appeal concerns disputes related to the financing of an oil and gas drilling project in Arkansas. In two issues that each contain multiple arguments within them, appellant The Strickland Group, Inc. (Strickland) appeals the trial court's take-nothing judgment in favor of appellees Pathfinder Exploration, LLC (Pathfinder) and Jerry Wilson. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## Background Facts

Strickland performs consulting services across the world, including reservoir engineering consulting and litigation support. In 2005, Strickland also wanted to become involved in the management and ownership of oil and gas properties. Pathfinder, among other business activities, puts together oil and gas projects and manages them from raising capital for operations to drilling and production.

Strickland's vice-president, Dwayne Purvis, who is a registered petroleum engineer, first spoke with Wilson, who is Pathfinder's managing member and sole stockholder, by telephone in August 2005.[2] According to Purvis, he and Wilson spoke about shale projects that Pathfinder was working on and on which Pathfinder needed significant capital funding (for drilling, leasing, and operations), including the Fayetteville Shale. Wilson told Purvis that Pathfinder was already part of a joint venture relating to the Fayetteville Shale and that Pathfinder needed money to fund its share of that joint venture.[3] Purvis told

---

[2]Wilson, Purvis, and Richard Strickland, Ph.D. (Dr. Strickland) had a mutual acquaintance who referred Strickland to Pathfinder. Dr. Strickland, whose doctorate degree is in petroleum engineering, formed Strickland in 2001 and is its CEO. Strickland is a privately held corporation that has four stockholders, including Dr. Strickland and Purvis.

[3]Pathfinder had previously obtained mineral leases in Arkansas and had entered into a joint venture with Shell Western Exploration and Production, Incorporated concerning those leases. Through the joint venture, Pathfinder agreed to manage the effort to acquire more leases.

Wilson that Strickland, which has helped a number of companies raise capital (including financing for oil and gas projects), was a consulting company.

At the end of Purvis and Wilson's first conversation, Wilson told Purvis that he would send a confidentiality agreement to Purvis. Purvis believed that the agreement would be used to protect the confidentiality of information that they had discussed and would continue to discuss in the future. The agreement, which Purvis and Wilson signed in September 2005, stated that Strickland would keep any data disclosed by Pathfinder confidential (with some exceptions) and would not use the data except to evaluate the terms of a potential transaction between Strickland and Pathfinder. The agreement also stated,

> [Pathfinder] reserves the right . . . to (i) decline to provide any Confidential Information to [Strickland]; (ii) discontinue or terminate continued disclosure of Confidential Information after commencing disclosure; (iii) conduct negotiations relating to a potential Transaction with [Strickland]; (iv) reject any and all proposals made by [Strickland] with regard to any potential Transaction; and (v) terminate discussions and negotiations regarding a potential Transaction with [Strickland] without notice and for any reason. The parties acknowledge that no Transaction between [Pathfinder] and [Strickland] shall exist unless and until a definitive agreement has been executed and delivered by each party.

After Purvis signed the confidentiality agreement, Wilson showed Purvis Pathfinder's production data, maps, and geologic data. In September 2005, Purvis, Wilson, and Dr. Strickland communicated about Pathfinder's need to raise capital and about various financing companies that could potentially support Pathfinder's operations. Purvis, under authority from the confidentiality agreement, used information that he had received from Pathfinder to prepare

3

presentations that he could make to financing companies so that those companies could decide whether they would finance Pathfinder's operations. Strickland required the financing companies to sign confidentiality agreements on behalf of Pathfinder before receiving a presentation, which included a binder containing an "Executive Summary" that had been prepared by Strickland and approved by Pathfinder. The Executive Summary contained information supplied by Pathfinder and by Strickland.

According to Purvis, before Strickland made presentations to potential funding sources, Strickland entered into a verbal agreement with Pathfinder. At trial, in describing his understanding of that agreement, Purvis testified,

> [W]e would try to find financing for [Wilson's] projects. We would do it on a sweat-equity basis. If we're successful and we're able to bring financing, then we [would] earn a 50/50 interest of whatever is earned from the financing company, and then we would go forward in the project as co-managers with him. That was . . . the skeleton.
>
> . . . .
>
> . . . If we didn't succeed, we got nothing. I was . . . content that I would take a risk on my ability to do the engineering and the worthiness of the projects that -- because he -- we had made this deal, I would put my time in, my company's time, to go try to find financing.
>
> . . . .
>
> . . . [I]f we failed, . . . then we would get . . . nothing out of it.

According to Purvis, although he had offered for Wilson to simply pay Strickland a consulting fee on a time and expenses basis for Strickland's work in finding a financing source for Pathfinder's operations, Wilson suggested the split

4

of revenue to Strickland that Pathfinder would make from the Fayetteville Shale project and was pleased with the agreement that had been made.[4]  Although Purvis took notes of some conversations related to Strickland's business with Pathfinder, he did not take notes of his conversation with Wilson about the alleged verbal agreement that they had made.  At trial, Wilson testified that before Pathfinder reached a written agreement with Strickland, those parties had an "understanding" to equally share Pathfinder's interest with Strickland if Strickland connected Pathfinder to a financing company that agreed to specific financing terms.

Purvis testified that after he reached the verbal agreement with Wilson,[5] Strickland eventually contacted several potential financing companies and made presentations to five of them, including Constellation Energy (Constellation), on behalf of both Strickland and Pathfinder.[6]  Strickland distributed the Executive Summary to Constellation near the end of October 2005 and met with Constellation around that time after Purvis had asked Constellation to sign a confidentiality agreement.  When Purvis first met with Constellation's officials, he

_____

[4]Dr. Strickland testified that before 2005, Strickland had only helped companies raise capital for oil and gas projects on an hourly fee basis.

[5]Purvis testified that the oral agreement with Wilson was not put into writing because it would have been "impractical" to do so without knowing what the terms of the financing were going to be.

[6]Strickland made presentations to two companies in Fort Worth and to three companies in Houston, four of which expressed no interest in financing Pathfinder's operations.  Some other companies declined interest in financing Pathfinder's operations without receiving a full presentation from Strickland.

told them that Strickland did not own an equity interest in the Fayetteville Shale project but hoped to earn one.

The Executive Summary proposed the payment of monthly management fees from a financing company to Pathfinder and Strickland, and it stated in part, "The management team of Pathfinder will include personnel of Pathfinder and of The Strickland Group, as well as external consultants." According to Purvis, Strickland's employees spent "about 450 man-hours" conducting geologic and engineering analyses for use in the Executive Summary and making presentations to financing companies concerning the Fayetteville Shale. Strickland's presentation to Constellation lasted a "number of hours."

Dr. Strickland believed that Constellation would eventually agree to fund Pathfinder's project and spoke with Wilson about Pathfinder's assigning an interest in the project to Strickland; at the time, Dr. Strickland understood that Pathfinder owned almost 5,000 acres in the Fayetteville Shale. According to Dr. Strickland, Wilson declined to make the assignment because funding had not been completed at that point. Dr. Strickland became uneasy about Wilson's reaction and emotion while saying that Pathfinder would not yet assign its interest to Strickland; Dr. Strickland began to worry that Wilson would not ever give up Pathfinder's interest. Dr. Strickland still believed, however, that Wilson's response showed that when funding was completed, Strickland and Pathfinder would sign all necessary documents to complete their transaction.

6

In early November 2005, Constellation informed Strickland that it was interested in continuing to discuss the possibility of funding Pathfinder's operations. On the request of Dr. Strickland, Purvis called Wilson to suggest that they enter into a written agreement regarding their own business relationship before continuing discussions with Constellation. Thus, Wilson's attorney drafted a Letter of Understanding (LOU), which Purvis received in the middle of November 2005. Purvis proposed changes to the LOU to "be more accurate" to his understanding of the verbal agreement, but Pathfinder's attorney refused the changes. The signed LOU, which Purvis has acknowledged that Strickland was bound by, stated in part,

> This letter sets forth the intentions of [Strickland] and [Pathfinder] to negotiate and execute a definitive agreement with respect to efforts by Strickland to acquire financing for Pathfinder in connection with the Arkansas Fayetteville Shale Project (the "Project").
>
> 1. Pathfinder owns an undivided 25% working interest[7] in approximately 4,700 net mineral acres in certain lands in . . . Arkansas. Pathfinder intends to acquire additional interests in lands within [Arkansas] . . . .
>
> 2. Strickland will attempt to identify one or more potential financing sources which will assume 100% of the financial obligations related to Pathfinder's working interest positions in the Project. *Strickland and Pathfinder anticipate that any financing arrangement reached with a financing source would result in the financing source assuming 100% of the costs related to Pathfinder's working interest, and Pathfinder retaining a carried working interest.* . . .

---

[7]A "working interest" is an interest in mineral leases that bears costs and revenue.

3. In the event that Pathfinder reaches a written agreement with a financing source which was first identified by Strickland (the "Strickland Financing Source") for financing the costs of Pathfinder's working interest in certain drilling units within the Project, Pathfinder and Strickland intend to negotiate and execute an agreement . . . by which Strickland will receive compensation for its services in connection with identifying the Strickland Financing Source. The agreement will include the following general terms:

(a) Strickland and Pathfinder will share equally the carried working interest retained by Pathfinder as a result of Pathfinder's agreement with the Strickland Financing Source, limited, however, to the carried working interest retained by Pathfinder . . . .

. . . .

(c) Pathfinder and Strickland will receive management fees in accordance with the agreement between Pathfinder and the Strickland Financing Source.

4. Strickland will bear its own expenses related to the identification of potential financing sources as described herein.

The parties intend that the foregoing will serve as a basis for entering into the Compensation Agreement described herein, which agreement shall contain such other or expanded terms and conditions as are appropriate to the financing transaction. Notwithstanding anything herein to the contrary, this Letter of Understanding does not constitute an agreement between the parties but is meant to express the intentions of the parties and their basic understandings so that further negotiations may take place for the creation of a formal agreement. [Emphasis added.]

By the time Wilson signed the LOU, Strickland had already made several presentations to potential financing sources. Purvis initially testified on direct examination that before Wilson delivered the LOU, Wilson had not stated that Pathfinder would want to maintain a carried working interest but had only required Strickland to find a financing source that would cover all of Pathfinder's costs. Later, Purvis said that Wilson had declared that he expected a carried

8

working interest but that Wilson had agreed to split "whatever the benefit" came from Pathfinder's agreement with a financing source. Purvis described the LOU's statement that Strickland and Pathfinder would share equally a "carried working interest" as a "deficiency of the letter" because it was "perfectly clear in multiple conversations" with Wilson that the companies would share in "anything that was retained." Also, Purvis testified that in 2005, he was concerned about the language in the LOU stating that it did not constitute an agreement, but he acknowledged that he believed the parties would subsequently enter into a "full-length, complete, lawyer-worked-up" contract if Strickland found a financing source for Pathfinder. Dr. Strickland also became concerned about some language in the LOU when he received it a week after Wilson signed it. Nonetheless, Purvis and Dr. Strickland testified that after receiving the LOU, they still believed that Strickland had a deal with Pathfinder to be partners in the Fayetteville Shale project, that they would share revenue generated from that project, and that Strickland would share in managing the project and be paid management fees related to that project.

Wilson opined at trial that the LOU was not a definitive agreement but was an "agreement to move forward under certain terms and conditions." He also stated that the terms of the LOU providing that Pathfinder needed a financing source that would assume all financial obligations and allow Pathfinder to retain a carried working interest were important to him.

9

After Purvis received the LOU, representatives from Constellation met with Wilson, other representatives from Pathfinder, and Purvis. According to Purvis, in December 2005, at a hearing in which Pathfinder produced evidence to the Arkansas Oil and Gas Commission, Constellation brought a term sheet to Wilson that contained a financing offer and some basic terms of the offer.[8] The term sheet stated that Constellation would contribute all of the capital required for the further acquisition of acreage and the development of the project. Purvis testified that Wilson showed him the term sheet and that Wilson expressed concerns about some terms of Constellation's offer.

According to Wilson, during December 2005, he talked with a representative from Constellation about Constellation's willingness to pay all capital costs for the Fayetteville Shale project, but the representative expressed concern about granting Pathfinder a carried working interest and about paying management fees to Strickland. Wilson testified that he notified Strickland in December 2005 that it had not brought a financing source that met the terms of the LOU.

Purvis sent Wilson an e-mail on December 15, 2005, suggesting some ways that Wilson could negotiate changes to the terms that Constellation was offering; Wilson testified that he never saw the e-mail, and according to Purvis, Wilson never responded to the e-mail. Meanwhile, in early January 2006,

_____

[8]The trial court admitted the term sheet as an exhibit. Wilson testified that he received the term sheet on a later date and that Purvis never saw it.

10

Constellation began its "due diligence process" with Pathfinder, including background checks, credit checks, and an accounting review, with a goal of completing a deal. Later that month, a man working on behalf of Constellation contacted Purvis for some information about the Fayetteville Shale, which concerned Purvis based on his belief, and Wilson's alleged representation, that Pathfinder and Constellation had not made an agreement. Purvis testified that Wilson never told him that Pathfinder and Constellation were making a deal and repeatedly denied that a deal was being agreed to.[9] Although Purvis testified that he had "two bits of data [he] didn't quite know how to reconcile," he "believed [Wilson] was telling . . . the truth, and [he] let it lie."

In February 2006, Purvis called Wilson and left a message because Purvis believed that Strickland had found another company that was interested in financing the Fayetteville Shale project. According to Purvis, Wilson never returned the call. In the same month, Wilson paid Strickland $21,050.52 for some of the services that Strickland had performed on Pathfinder's behalf. Two months later, Pathfinder entered into a financing agreement with Constellation

---

[9]Wilson conceded that he never advised Strickland about Pathfinder's deal with Constellation. He testified, however, that he did not recall having conversations with Purvis about whether Pathfinder had entered into an agreement with Constellation or receiving telephone calls inquiring about the agreement. Wilson conceded that he received an e-mail inquiring about Pathfinder's negotiations with Constellation but did not respond to the e-mail.

11

that contained different provisions than the conditions contained in the term sheet.[10]

Tracey Black, who has a degree in petroleum engineering and worked for Constellation in 2005 and 2006, testified that he first met someone from Pathfinder in late 2005 or early 2006 and that although he knew Purvis, "[Wilson] and his team" played a larger role in Pathfinder's presentation to Constellation. Black recalled asking Purvis what Strickland's relationship was with Pathfinder, and he said that Purvis replied that Strickland did not have a formal relationship with Pathfinder but was in the process of making one. Black testified that he could not recall discussions within Constellation of Strickland having any involvement in Constellation's deal with Pathfinder on a go-forward basis, and he testified, "[A]s far as the structuring of the deal went, [Strickland] did not play a critical role." Black also stated that he had assumed that Strickland was working for Pathfinder on a fee basis and that

> [Constellation] viewed [Wilson] as [its] partner in this deal . . . . And the way we structured the management fee in there was to allow him to do what he needed to do to make sure that the project was being managed properly. We did not put a lot of constraints on him as to how he wanted to do that. We were going to hold him responsible for it and compensate him for that.
>
> So, you know, if he had some plan to bring in [Strickland] or to have them do a lot of work, that was not -- it was not something that we focused on a whole lot or -- or were particularly concerned about.

---

[10]Wilson testified that Constellation's proposal in the term sheet, which included a 25% return to Constellation on its capital costs, was "too rich."

Wilson testified that Pathfinder's final agreement with Constellation did not allow Pathfinder to retain a carried working interest.

In October 2006, Purvis's partner, Brad Nickle, began performing work on behalf of Constellation on an unrelated matter. Through that relationship, Strickland learned of Constellation's agreement with Pathfinder. Purvis became "furious." He and Dr. Strickland testified that Strickland did not immediately sue Pathfinder because Strickland was concerned about the impact that suing would have on its other business relationships, including its relationship with Constellation. Pathfinder eventually received distributions from producing wells in the project and remitted portions of those distributions to Constellation, and Pathfinder also received monthly management fees from Constellation, although Wilson testified that the management fees did not cover Pathfinder's costs.

In January 2009, Purvis learned that Constellation and Pathfinder had sold most of their oil and gas interests in the Fayetteville Shale to XTO.[11] Strickland later discovered that $150 million had been paid for the Fayetteville Shale project and that Pathfinder had made approximately $4.5 million (or 3%) from the sale. After learning of the sale to XTO, Strickland decided to sue appellees and to seek half of Pathfinder's revenue from the sale.[12]

---

[11]Pathfinder retained a small interest in some of the oil and gas properties in the Fayetteville Shale.

[12]Warren Cole, a certified public accountant, testified that he had reviewed the LOU, the agreement between Constellation and Pathfinder, invoices for management fees from Pathfinder to Constellation, records related to XTO's

In April 2009, Strickland sued Pathfinder and Wilson, alleging that they had breached the LOU by not sharing revenue related to Pathfinder's alleged carried working interest, that they had committed fraud by making false representations, that they had breached a fiduciary duty allegedly created through a special relationship with Strickland,[13] and that Strickland had provided valuable services for which it was entitled to recover under a quantum meruit theory. Appellees answered Strickland's lawsuit through asserting a general denial, making verified pleas that the written instruments upon which Strickland's suit was founded were without consideration and that the parties had not entered into a partnership, and pleading several affirmative defenses.

Appellees sought summary judgment on Strickland's breach of contract claim, contending that the LOU was not a binding agreement and that the parties had never entered into a formal, enforceable contract. Later, appellees moved for summary judgment on Strickland's claims for breach of a fiduciary relationship and fraud. The trial court denied appellees' motions for summary judgment. Strickland later amended its petition to additionally allege that the parties had

purchase of Pathfinder's interests in the Fayetteville Shale, and other records. Based on this review, Cole testified that Pathfinder had received $5,888,222 in gross total benefits as a result of obtaining financing from Constellation; thus, Cole opined that Strickland, if sharing all benefits equally with Pathfinder, would be entitled to $2,944,111.

[13]Strickland alleged that appellees had "clandestinely enter[ed] into [a] secret transaction with [Constellation] to their benefit." At trial, Purvis opined that Constellation "bore no liability" for Wilson's alleged deceit.

14

entered into a joint venture and to assert a claim of fraud by nondisclosure, contending that appellees had concealed their dealings with Constellation while having a duty to disclose them.

After Strickland presented evidence and rested its case, appellees sought a directed verdict on all of Strickland's claims. The trial court granted the motion only to the extent that it dismissed Strickland's breach of contract, breach of fiduciary duty, and quantum meruit claims against Wilson individually and dismissed Strickland's claim for exemplary damages. After appellees presented evidence and rested, they again moved for a directed verdict, but the trial court denied that motion.

During appellees' presentation of evidence, Wilson recognized that Strickland had first identified Constellation as a potential financing source. Also, Wilson testified that if Strickland could have connected Pathfinder with a financing source that met all of the requirements stated in the LOU, Pathfinder "would have . . . honored the deal" by sharing Pathfinder's carried working interest. Wilson testified, however, that Strickland did not present a financing source that allowed Pathfinder to retain a carried working interest or that paid all of Pathfinder's costs. Specifically, Wilson testified that Pathfinder contributed money to the project in the form of lease costs, travel, mapping, and software. Regarding Strickland, Wilson testified, "They brought Constellation to the table. They did not fulfill the terms and conditions [of the LOU]."

15

After considering all the evidence and arguments presented by the parties, the jury found, in answering the first two questions of the trial court's charge, that Strickland and Pathfinder had intended to bind themselves to an agreement that if Strickland obtained financing for 100% of the financial obligations related to Pathfinder's oil and gas projects and if Pathfinder retained a carried working interest in those projects, those parties would further negotiate and sign an agreement to jointly manage the projects and would equally share in any revenue generated by the projects. But in answering the third question, the jury found that Strickland had not identified a financing source that had assumed 100% of Pathfinder's financial obligations or that allowed Pathfinder to retain a carried working interest. Thus, the jury determined that Pathfinder had not breached its agreement with Strickland.

The jury also found that neither Pathfinder nor Wilson had committed fraud against Strickland and that Pathfinder and Strickland had not entered into a partnership. In answering the twenty-second and twenty-third questions of the charge, the jury found that Strickland had performed compensable work for Pathfinder (therefore finding in favor of Strickland's quantum meruit claim) and assessed the value of that work at $16,700. All of the jury's findings were unanimous.

Appellees filed a motion for the trial court to enter a take-nothing judgment, contending that the jury's assessment of quantum meruit damages for Strickland could not be legally supported because the jury had found that a contract

16

governed the parties' transaction and because Strickland did not expect to be paid by Pathfinder outside of the conditions expressed in the contract.  Strickland opposed appellees' motion, but after hearing arguments from the parties, the trial court granted it and entered a take-nothing judgment in appellees' favor.  Strickland filed a motion for new trial, alleging that some of the jury's findings were unsupported by the evidence, that the trial court's charge contained errors, and that the trial court had erroneously excluded evidence.  The trial court denied Strickland's motion for new trial by operation of law,[14] and Strickland brought this appeal.

## Evidentiary Sufficiency

In the first part of its first issue, Strickland contends that the trial court's judgment is erroneous because the jury's answers concerning the parties' agreement are against the great weight and preponderance of the evidence and are manifestly unjust.  On appeal, Strickland appears to concede that appellees' performance of any contractual agreement was conditioned upon Strickland identifying a financing source that assumed 100% of the financial obligations related to Pathfinder's working interest position in the project.  Strickland argues, however, that contrary to the jury's answer to question number three of the jury

---

[14]*See* Tex. R. Civ. P. 329b(c).

charge, the evidence showed that Pathfinder's financial obligations were fully covered.[15]

Strickland recognizes that its challenge is to the factual sufficiency of the evidence supporting the jury's answer to question number three. When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). When conducting a factual sufficiency review, we may not merely substitute our judgment for that of the trier of fact. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). The trier of fact is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *Id.* Absent an objection to the jury charge, the sufficiency of the

---

[15]Strickland does not challenge the language of question number one of the charge or the jury's answer to that question, in which the jury found that Strickland and Pathfinder intended to "bind themselves to an agreement that *if Strickland obtained financing for 100% of the financial obligations related to Pathfinder's oil and gas projects*, then they would further negotiate and sign an agreement to jointly manage the projects and equally share in any revenue generated by the projects." [Emphasis added.]

18

evidence is reviewed in light of the charge submitted. *W.L. Lindemann Operating Co. v. Strange*, 256 S.W.3d 766, 775 (Tex. App.—Fort Worth 2008, pet. denied).

Question number three of the jury charge asked whether Strickland had identified a financing source that "signed a written agreement with Pathfinder" in which the source "assumed 100% of Pathfinder's financial obligations related to Pathfinder's working interest." Strickland has not challenged the language of this question at trial or on appeal; instead, it contends that the great weight of the evidence shows that Constellation assumed all of Pathfinder's financial obligations related to Pathfinder's working interest. But the jury heard several witnesses testify that Pathfinder was responsible for certain costs associated with its working interest and paid those costs, and more importantly, the written agreement between Constellation and Pathfinder, which the trial court admitted, establishes Pathfinder's obligation to share in paying certain costs.

The joint development agreement that Pathfinder and Constellation entered into in April 2006 stated, in section 4.1, that Pathfinder would convey to Constellation 80% of Pathfinder's interest in the leasehold interests owned by Pathfinder on the date of the agreement. Although the joint development agreement provided that Constellation would pay "Lease Bonus Obligations" (which included, for example, bonus and acquisition costs, title costs, and travel costs) that existed on the date of the agreement, it also contemplated that the parties would seek to acquire more leases in various Arkansas counties. Section 5.4 stated, "All Lease Bonus Obligations incurred *after the date of this Agreement*

19

. . . shall be included in the determination of Lease and Capital Costs under Section 8.1 of this Agreement and paid for from the Lease and Capital Reserve Account." [Emphasis added.] Section 8.1 stated that the parties agreed to maintain a "Lease and Capital Reserve" of funds designated for, among other costs, Lease Bonus Obligations. Article 8 of the agreement also stated,

> The Lease and Capital Reserve Account shall be a segregated account to be maintained as a trust account for the benefit of the Parties as to *their respective contributions to the account* . . . . Withdrawals from the account shall be made solely for the purpose of *paying Lease and Capital Costs* agreed to by the Parties or as otherwise provided in this [Article 8]. No less than monthly, the Parties will jointly determine the Lease and Capital Costs, for the succeeding 3 month period . . . .
>
> . . . The Parties agree to deposit to the Lease and Capital Reserve Account 100% of *their respective net revenues* (*after deduction* of royalties, *operating expenses*[,] and severance taxes) from the sale of oil and gas production from wells . . . directly to the Lease and Capital Reserve Account. If at any time the Lease and Capital Reserve equals or exceeds 115% of the Lease and Capital Requirements determined for the subsequent 3 month period under the provisions of Article 8.1, the Parties may withdraw any such excess . . . in accordance with their respective interest . . . .
>
> . . . All Lease and Capital Costs *will be paid* from the Lease and Capital Reserve Account, provided that if the Lease and Capital Reserve is not adequate to fund 100% of any Lease and Capital Requirements, [Constellation] agrees to bear 100% of any such shortfall. . . .

Appendix E to the joint development agreement, which Article 8 referred to, displayed a sample calculation for the Lease and Capital Reserve Account and showed that revenue from each party's share of production would be used to pay for capital costs.

20

As witnesses testified at trial, the effect of these provisions of the joint operating agreement required a share of Pathfinder's revenue from producing wells to be allocated to pay for expenses of the project. Black, who worked on Constellation's deal with Pathfinder in 2005 and 2006, testified concerning the provisions quoted above that both parties' shares of revenue from the production of oil and gas were placed into the reserve account "lockbox" from which future investments were funded. Specifically, in responding to a question about whether Pathfinder had operational costs in its agreement with Constellation, Black testified,

> As I recall, all costs related to the project were funded out of this capital reserve. . . . So as soon as there was any money that was coming in from producing wells, [Pathfinder] would have been picking up some share of that because their revenue would have been allocated to them.

Black also explained that once capital costs could be fully paid by revenue that was received, Pathfinder was still obligated to pay a share of costs that was proportionate to its interest in the wells. Thus, Black explicitly testified that Constellation did not assume 100% of the financial obligations related to Pathfinder's working interest positions in the Fayetteville Shale project.

George Hite, who is a petroleum engineer, testified on behalf of appellees that Pathfinder's share of the money from the production of wells, instead of being directly paid to Pathfinder, was placed together with Constellation's share of the money from production into the lockbox and could be used to pay for capital expenses, although Constellation agreed to cover a shortfall of capital

21

expenses if the parties' joint revenue from production did not cover them. Hite explained that Pathfinder never received revenue from producing wells "in [its] pocket" because "[w]hat [Pathfinder] made from their wells went into [the lockbox]." Under Pathfinder's agreement with Constellation, Hite described Pathfinder as being in "an investment position." Hite also noted that when XTO purchased Pathfinder's and Constellation's interests, Pathfinder paid Constellation a significant sum for Pathfinder's share of costs.

Glenn Grizzle, Pathfinder's accountant, repeatedly stated that Pathfinder paid money ($882,000) to Constellation after the XTO sale for Pathfinder's share of expenses, including operating expenses, relating to the project. Grizzle also stated that Pathfinder was required to pay some of its expenditures by the effect of Constellation recouping all of its expenditures plus 15% of them before Pathfinder received revenue. Grizzle referred to, and the record contains, an e-mail from a representative at Constellation concerning "amounts to be funded from [Pathfinder] to Constellation" at the closing of the XTO sale.

Cole, the CPA called by Strickland, testified that Pathfinder paid expenses, including "lease operating expenses and capital *that Pathfinder owed*" to Constellation at the time of the sale. [Emphasis added.] Cole testified that Pathfinder's deal with Constellation was "100 percent financed by Constellation until you got to the end, and then there was this true up at the end. *Constellation got reimbursed for their expenses. . . . The carry was no longer applicable at the end of the day*, and they settled up the accounts." [Emphasis added.] An

22

agreement between Constellation and Pathfinder to terminate their joint development agreement stated in part, "The parties agree that [Constellation] is entitled to payment by Pathfinder of any outstanding amounts, including . . . overhead and administrative expenses, lease and operating expenses, or any other amounts paid by [Constellation] on behalf of Pathfinder . . . ."[16]

Wilson testified unequivocally that Strickland did not identify a financing source that paid all of Pathfinder's costs. He explained that Constellation agreed to cover a hundred percent of the costs "[o]n the shortfall" of funding on the project that could not otherwise paid by the parties' revenue from producing wells that had been placed in the lockbox.

For these reasons, we conclude that factually sufficient evidence supports the jury's finding that Strickland did not identify a financing source that signed a written agreement with Pathfinder in which the financing source assumed 100% of Pathfinder's financial obligations related to its working interest. *See Pool*, 715 S.W.2d at 635. We overrule that part of Strickland's first issue. Because the unchallenged language of question one of the jury charge required Strickland to find a financing source that would pay 100% of Pathfinder's obligations before any contractual performance by Pathfinder became due, our holding above is dispositive of Strickland's breach of contract claim. Thus, we overrule other parts of Strickland's first issue in which it argues that the evidence is factually

---

[16]Strickland recognizes in its brief that Pathfinder "reimbursed Constellation for the financing . . . at the end of the Project."

23

insufficient to show that Pathfinder did not retain a carried working interest (which is germane to part of question number three of the jury charge) or that Pathfinder failed to comply with its agreement with Strickland (which is germane to question number four). *See* Tex. R. App. P. 47.1; *City of Haltom City v. Aurell*, 380 S.W.3d 839, 859 n.17 (Tex. App.—Fort Worth 2012, no pet.).

Next, Strickland contends that the evidence is factually insufficient to support the jury's negative answer to question number seven of the charge, which asked whether Pathfinder or Wilson committed fraud against Strickland. Strickland argues that appellees committed fraud because they entered into the LOU with no intention of performing their obligations under it and because they denied "the existence of an agreement with Constellation."

A party commits fraud by (1) making a false, material misrepresentation (2) that the party either knows to be false or asserts recklessly without knowledge of its truth (3) with the intent that the misrepresentation be acted upon, (4) and the person to whom the misrepresentation is made acts in reliance upon it (5) and is injured as a result. *Lindley v. McKnight*, 349 S.W.3d 113, 128 (Tex. App.—Fort Worth 2011, no pet.); *W.L. Lindemann Operating Co.*, 256 S.W.3d at 776. Strickland first contends that appellees misrepresented that if Strickland found a financing source for Pathfinder, Pathfinder and Strickland would negotiate an agreement to share Pathfinder's revenue from the Fayetteville Shale project equally. Strickland contends that appellees' representations were "false because [they] failed to negotiate a compensation agreement with

24

[Strickland] after [Strickland] located a financing source," and Strickland claims that it was injured because it did not receive the compensation that it was allegedly "entitled to" under the LOU. But as explained above, the jury heard factually sufficient evidence that Strickland did not meet an obligation under the LOU (identifying a financing source that assumed 100% of Pathfinder's financial obligations) as to trigger the performance of any obligations by Pathfinder under that agreement.

Also, to the extent that Strickland argues that appellees never intended to perform under LOU even if Strickland had fulfilled its obligations under that agreement, Wilson testified that he had hoped that Strickland would find a financing source that met the conditions of the LOU and that if Strickland had done so, the parties "would have definitely entered into an understanding agreement, sign[ed] the documents, honored the deal[,] and moved forward." Wilson also testified that he would have been willing to share a carried working interest with Strickland if Strickland would have identified a proper financing source. The jury, as the factfinder, was the sole judge of the credibility of Wilson's testimony that he intended to honor the LOU and was free to accept that testimony. *See Golden Eagle Archery, Inc.*, 116 S.W.3d at 761; *Foley v. Parlier*, 68 S.W.3d 870, 879 (Tex. App.—Fort Worth 2002, no pet.).

Finally, Strickland argues that appellees committed fraud by failing to disclose Pathfinder's agreement with Constellation. "Fraud by nondisclosure is a subcategory of fraud." *Rice v. Metro. Life Ins. Co.*, 324 S.W.3d 660, 679 (Tex.

25

App.—Fort Worth 2010, no pet.). To establish fraud by nondisclosure, a plaintiff must prove that (1) the defendant failed to disclose material facts to the plaintiff, (2) the defendant had a duty to disclose those facts, (3) the defendant knew the plaintiff was ignorant of the facts and the plaintiff did not have an equal opportunity to discover the facts, (4) by failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting, (5) the plaintiff relied on the defendant's nondisclosure, and (6) the plaintiff was injured as a result of acting without that knowledge. *See Bus. Staffing, Inc. v. Jackson Hot Oil Serv.*, 401 S.W.3d 224, 238 (Tex. App.—El Paso 2012, pet. denied); *Avery Pharms., Inc. v. Haynes & Boone, L.L.P.*, No. 02-07-00317-CV, 2009 WL 279334, at *10 (Tex. App.—Fort Worth Feb. 5, 2009, no pet.). The only injury that Strickland identifies on appeal resulting from appellees' alleged fraud by nondisclosure, however, is that Strickland never "received the compensation [it was] entitled to under the agreement." We have concluded above that the evidence is factually sufficient to support the jury's finding that Strickland was not entitled to compensation under the LOU. Thus, because Strickland's fraud by nondisclosure claim, as argued, is dependent on success in its breach of contract claim, we must conclude that the evidence is factually sufficient to support the jury's rejection of Strickland's fraud by nondisclosure claim.[17]

---

[17]Similarly, although Strickland contends that appellees affirmatively misrepresented in January 2006 that "nothing was happening with Constellation," Strickland has not identified any injury resulting from the alleged

26

For all of these reasons, we conclude that the jury's answers that neither Pathfinder nor Wilson committed fraud or fraud by nondisclosure against Strickland were based on factually sufficient evidence. *See Pool*, 715 S.W.2d at 635. We overrule that part of Strickland's first issue.

In another part of its first issue, Strickland challenges the jury's answer to question number eleven of the charge, in which the jury found that Strickland and Pathfinder did not enter into a partnership. As part of question number eleven, the trial court instructed the jury that a partnership is an association of two or more persons to carry on a business for profit and that factors indicating the creation of a partnership include

> (1) receipt or right to receive a share of profits of the business;

> (2) expression of an intent to be partners in the business;

> (3) participation or right to participate in the control of the business;

> (4) agreement to share or sharing:

>> a. losses of the business; or

>> b. liability for claims by third parties against the business; and

> (5) agreement to contribute or contributing money or property to the business.[18]

---

misrepresentation other than not receiving compensation under the terms of the LOU.

[18]These are the factors for creation of partnership listed within the business organizations code. *See* Tex. Bus. Orgs. Code Ann. § 152.052(a) (West 2012).

With respect to the first factor, Strickland argues that the evidence establishes that the "parties agreed to share the profits related to the [Fayetteville Shale project] 50/50" and that the parties "agreed to work together in a sweat equity deal where [Strickland] would receive equity . . . because of the work it did." In the part of the record that Strickland cites to support these claims, however, Purvis expressed his understanding that "[i]f [Strickland was] successful and [was] able to bring financing," it would earn a "50/50 interest of whatever [was] earned from the financing company."[19] Purvis also recognized that if Strickland did not bring financing to Pathfinder, it "got nothing" and Pathfinder would "still own [its] interest in Arkansas." Later in his testimony, Purvis recognized that before delivering the LOU draft, Wilson had expressed his desire to have all of Pathfinder's financial obligations covered by the financing company and that the LOU incorporated that understanding. Also, Purvis testified that based on language in the LOU, he believed that "[a]ssuming that a source that [Strickland] brought funded [Pathfinder's] deal, then [Strickland and Pathfinder] would create . . . long partnership agreements."[20] Purvis recognized that Strickland had agreed to "eat the expenses [it] incurred" if it was unable to find a financing source for Pathfinder; he also stated, "If [Strickland] didn't find

_____

[19]We will highlight Purvis's testimony about his interactions with Wilson because Purvis testified that Dr. Strickland "was not involved in the discussions with [Wilson] about deal terms."

[20]As explained above, the LOU contemplated that the parties would enter into another agreement if the terms of the LOU were satisfied.

28

financing, then no harm, no foul; *everybody goes their own way* and we've got a 70-plus-thousand-dollar swing, you know, swing at the ball." [Emphasis added.] Purvis recognized at trial that he did not ask for the LOU to specifically mention anything about a partnership or joint venture between Strickland and Pathfinder and that the LOU did not do so. Also, Purvis said that although he had formed several partnerships and had used formal written agreements to do so, no written partnership agreement existed between Strickland and Pathfinder. Based on all of this evidence, we conclude that the jury could have reasonably found that Strickland and Pathfinder had not agreed to share profits but had instead agreed to enter into another agreement regarding the creation of a partnership and the sharing of profits only upon Strickland's fulfillment of certain conditions that it did not, in fact, fulfill. *Cf. Arnold v. Caprielian*, 437 S.W.2d 620, 625 (Tex. Civ. App.—Tyler 1969, writ ref'd n.r.e.) (stating that "[p]ersons who have entered into a contract to become partners at some future time or on the happening of some future contingency do not become partners until or unless the agreed time has arrived or the contingency has happened").

Next, regarding the second and third factors listed above, although Strickland argues on appeal that the parties held themselves out as joint managers of the Fayetteville Shale project to Constellation and that the parties agreed to jointly manage the project, Purvis testified that he told Constellation that Strickland "expect[ed] to earn" an interest in the project and that Wilson had the authority to decide whether to make a deal with Constellation. Concerning

29

the fourth factor, Purvis testified that he did not recall ever explicitly discussing with Wilson the possible sharing of losses from any proposed partnership that they could enter into, but he testified that they had "discussed working together as a team on the projects," which, in Purvis's belief, would normally include sharing losses.

At one point, Dr. Strickland testified that he did not believe that Pathfinder and Strickland had formed a partnership in the legal sense although he believed that the parties were "headed" in that direction after Wilson signed the LOU. Dr. Strickland testified that although Wilson once mentioned the concept of being partners to him, Wilson never specifically said that there was an agreement to share losses.

For all of these reasons, we hold that the evidence is factually sufficient to support the jury's finding that Strickland and Pathfinder did not create a partnership. *See Pool*, 715 S.W.2d at 635. We overrule that part of Strickland's first issue.

In the last part of its first issue, Strickland asserts that the trial court erred by entering a take-nothing judgment on its claim for quantum meruit despite the jury's award of $16,700 on that claim (in its answer to question twenty-three of the jury charge) and that the evidence proved that the award should have been higher than $16,700. Appellees contend that as a matter of law, Strickland is not entitled to damages on a quantum meruit theory because, among other reasons, the parties' relationship was governed by a contract.

30

To recover in quantum meruit, a plaintiff must prove that it rendered valuable services or furnished materials for the person sought to be charged; that the services or materials were accepted, used, and enjoyed by the person sought to be charged; and that the plaintiff reasonably notified the person sought to be charged that the plaintiff was expecting to be paid by the person sought to be charged. *See KUV Partners, LLC v. Fares*, No. 02-09-00246-CV, 2011 WL 944453, at *16 (Tex. App.—Fort Worth Mar. 17, 2011, pet. denied) (mem. op. on reh'g) (citing *Vortt Exploration Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990)). As we have explained, quantum meruit "is an equitable remedy which does not arise out of a contract but is independent of it. Generally, a party may recover under quantum meruit only when no express contract covering the services or materials furnished exists." *Residential Dynamics, LLC v. Loveless*, 186 S.W.3d 192, 198 (Tex. App.—Fort Worth 2006, no pet.) (citation omitted); *see In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005) (orig. proceeding); *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000) ("[P]arties should be bound by their express agreements. When a valid agreement already addresses the matter, recovery under an equitable theory is generally inconsistent with the express agreement.").

Appellees' predicated their motion for the trial court to enter a take-nothing judgment on the jury's finding (in response to question number one of the charge) that a contract existed concerning Strickland's effort to find financing for Pathfinder. In the motion, appellees noted that in Strickland's second amended

31

petition, which was its live pleading at the time of the trial, it expressly based its quantum meruit claim on preceding paragraphs in the pleading that concerned the contractual agreement between the parties. In responding to the motion, Strickland conceded that the jury had found that the parties intended to be bound to an agreement of some kind but contended that the jury had not found that a contract between the parties existed because it had found that Strickland did not satisfy the conditions of the LOU. Strickland also contended that it had partially performed a unilateral contract between the parties.

We agree with appellees that Strickland's claim for quantum meruit damages is precluded by the jury's finding that a contractual agreement existed and by the fact that Strickland explicitly seeks compensation for finding a financing source, which was a service covered by the explicit terms of that agreement—the LOU—and not covered by the possible future agreement between the parties that the LOU contemplated. In its brief, Strickland contends that its compensable services concern the time it spent in preparing and presenting information about the Fayetteville Shale project to financing companies, including the preparation of the Executive Summary.[21] In answering "Yes" to the first question of the jury charge, the jury found that Strickland and Pathfinder intended to bind themselves to an agreement that if Strickland obtained financing for all of Pathfinder's obligations in its oil and gas projects,

_____
[21]Likewise, in its closing argument, Strickland contended that the "services" that were compensable related to bringing "Constellation to the table."

32

those parties would sign an agreement to share in revenue generated by the projects. Purvis recognized during his testimony that the LOU required Strickland to "eat both the loss of [its] consulting time . . . and eat the expenses [it] incurred" if it could not find a funding source that met the requirements of the LOU. And the LOU itself stated that Strickland would "bear its own expenses related to the identification of potential financing sources." Thus, we conclude that because the jury found that the parties agreed to intend to bind themselves to terms expressed in the LOU, because the LOU conditioned compensation to Strickland on finding a financing source that assumed all of Pathfinder's obligations in the Fayetteville Shale project, because the LOU expressed that Strickland would bear its own expenses, and because Strickland now seeks compensation for its services in finding a financing company, Strickland's quantum meruit claim is precluded by the express agreement between the parties. *See Truly v. Austin*, 744 S.W.2d 934, 936 (Tex. 1988) ("[A] plaintiff who seeks to recover the reasonable value of services rendered or materials supplied will be permitted to recover in quantum meruit only when there is no express contract *covering those services or materials*.") (emphasis added).

Strickland alternatively argues that it partially performed a unilateral contract and may still therefore recover damages for quantum meruit. "Recovery in quantum meruit is sometimes permitted when a plaintiff partially performs an express contract that is unilateral in nature." *See id.* at 937. But recovery under a quantum meruit claim requires the plaintiff's expectation of payment, and as

33

appellees argued in the trial court in replying to Strickland's response to appellees' motion for the entry of a take-nothing judgment, the evidence shows that Strickland did not expect to be paid for any partial, incomplete performance of the LOU. *See KUV Partners, LLC*, 2011 WL 944453, at *16; *see also Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 49 (Tex. 2008) (op. on reh'g); *Fulgham v. Fischer*, 349 S.W.3d 153, 159 (Tex. App.—Dallas 2011, no pet.); *Smith v. Pulliam, Inc.*, 388 S.W.2d 329, 331 (Tex. Civ. App.—Fort Worth) ("Quantum meruit is founded upon the rule that it is inequitable for a party to refuse to pay for the benefits he received or for work performed for him with his knowledge and consent *by someone who is authorized to expect remuneration therefor*.") (emphasis added), *writ ref'd n.r.e.*, 394 S.W.2d 791 (Tex. 1965). At trial, Purvis characterized Strickland's agreement with Pathfinder as a "sweat-equity" arrangement in which Strickland would be compensated only upon successfully finding a proper financing company for Pathfinder, and Purvis stated that the agreement was structured in that manner because Wilson did not want to pay Strickland "consulting dollars to help him raise funding." Purvis testified that he was "content" to "take a risk . . . to go try to find financing." He also recognized that it was Strickland's duty under the LOU to find a financing source that would assume all of Pathfinder's financial obligations for its working interest.[22] Thus, assuming that Strickland partially

---

[22]Similarly, in its argument on appeal concerning quantum meruit, Strickland states, "Pathfinder promised a benefit to [Strickland] . . . *if* [Strickland]

performed a unilateral agreement, we conclude that the trial court did not err by entering a take-nothing judgment on appellees' behalf because Strickland did not expect to be compensated for such performance. *Cf. Pantaze v. Iskander*, No. 05-95-00984-CV, 1996 WL 640604, at *3 (Tex. App.—Dallas Oct. 29, 1996, no writ) (not designated for publication) (holding that a plaintiff could not recover under a quantum meruit claim when the plaintiff, an attorney, understood that he was working on a contingency basis and therefore could not have expected compensation on an hourly basis).

For all of these reasons, we conclude that the evidence is factually sufficient to support the jury's answers to the questions of the charge that Strickland has challenged and that the trial court properly entered a take-nothing judgment on Strickland's quantum meruit claim. We overrule Strickland's first issue.

## The Trial Court's Exclusion of Evidence

In the first part of its second issue, Strickland contends that the trial court abused its discretion by refusing to admit evidence that Strickland offered in rebuttal after both parties had rested. A trial court's rulings in admitting or excluding evidence are reviewable under an abuse of discretion standard. *Richmond Condos. v. Skipworth Commercial Plumbing, Inc.*, 245 S.W.3d 646, 664 (Tex. App.—Fort Worth 2008, pet. denied) (op. on reh'g). "To determine

---

obtained financing for 100% of the financial obligations related to Pathfinder's projects."

35

whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable." *Id.* (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied*, 476 U.S. 1159 (1986)). Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Id.*

During appellees' cross-examination of Purvis, their counsel asked him about his decision to record a telephone conversation with Wilson in October 2006. At a bench conference immediately following a question related to the recording, Strickland's counsel represented that he had withdrawn exhibits concerning the recording but would want to reoffer them because appellees were opening the door to their admission. Later, during appellees' direct examination of Wilson, counsel asked him about the recorded call.

After both parties rested, Strickland attempted to recall Wilson as a rebuttal witness, to play the recorded call, and to ask Wilson about it. Strickland contended that appellees had opened the door to the admission of the recording. Appellees objected to Strickland playing the tape or admitting a transcript of the recording on the basis that Strickland should have offered that evidence during its case-in-chief. The trial court sustained appellees' objection.

Assuming that the trial court erred by sustaining appellees' objection to Strickland's attempt to recall Wilson and to play the recording, we must determine whether that error caused harm. To obtain reversal of a judgment based upon an error in the trial court, the appellant must show that the error probably caused rendition of an improper judgment or probably prevented the appellant from properly presenting the case to this court. Tex. R. App. P. 44.1(a); *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 225 (Tex. 2005). "The complaining party must usually show that the whole case turned on the evidence at issue. The party need not show that a different judgment would necessarily have been rendered, but only that the error probably resulted in an improper judgment." *Hong v. Bennett*, 209 S.W.3d 795, 804–05 (Tex. App.—Fort Worth 2006, no pet.) (citation omitted); *see also Bedford v. Moore*, 166 S.W.3d 454, 465 (Tex. App.—Fort Worth 2005, no pet.) (stating that the exclusion of evidence is "harmful only if the evidence is controlling on a material issue and is not cumulative" and that a "successful challenge to an evidentiary ruling generally requires showing that the judgment turned on the particular evidence in dispute").

Strickland does not particularly discuss harm or expressly address how the overall presentation of its case or the jury's resolution of the questions presented in the charge turned on the trial court's exclusion of rebuttal testimony from Wilson about the recording. Instead, Strickland succinctly argues that the evidence should have been admitted because it allegedly disproved Wilson's

37

prior testimony that he had never lied to Purvis about Pathfinder's agreement with Constellation. We agree with appellees, however, that the evidence, even if admitted, would not have likely accomplished that purpose.

The transcript from the recorded phone call, which the trial court excluded, contains the following question and answer that Strickland relies on as proof that Wilson allegedly lied:

> [PURVIS]: . . . So you guys are funding [the Fayetteville Shale project] internally?
>
> [WILSON]: I've . . . pretty well got the funding with . . . the *groups that I put together to say let's look at the Fayetteville*, but most of my stuff right now . . . is moving . . . back toward Oklahoma.

It is evident that in this exchange, Wilson did not claim that Pathfinder was funding the Fayetteville Shale project internally or that Constellation was not involved in the project; he stated only that the project was being funded by groups that he put together. As appellees argue, it is clear that Strickland did not participate in negotiating or structuring the ultimate, signed agreement between Constellation and Pathfinder. Purvis testified that by the beginning of January 2006, he had been "cut out" of Pathfinder's dealings with Constellation. Pathfinder signed its agreement with Constellation in April 2006 after negotiating significant changes to terms of the agreement from what originally appeared in the December 2005 term sheet that Purvis testified he saw. Purvis stated at trial that Wilson "didn't need [Purvis's] help" to complete an agreement with Constellation.

38

Thus, although the evidence shows that Strickland initially introduced Pathfinder to Constellation, it does not prove that Wilson necessarily lied when he told Purvis in October 2006 that the Fayetteville Shale project was being funded by groups that Wilson put together. Furthermore, the jury had more direct evidence, from Purvis's testimony, that Wilson "repeatedly" lied. The exclusion of evidence is generally not harmful when the excluded evidence is cumulative of other evidence. *See Gen. Motors Corp. v. Burry*, 203 S.W.3d 514, 544–45 (Tex. App.—Fort Worth 2006, pet. denied) (op. on reh'g).

Because Strickland only argues that the excluded evidence was relevant to showing that Wilson lied, the evidence does not necessarily satisfy that purpose, and Strickland does not argue that the exclusion of the evidence was otherwise harmful, we conclude that the exclusion of the evidence did not likely lead to the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a); *Bedford*, 166 S.W.3d at 465. We overrule the first part of Strickland's second issue.

**Alleged Jury Charge Errors**

In the last part of its second issue, Strickland argues that question numbers twelve and thirteen of the charge were erroneously submitted to the jury because they were irrelevant to the contested issues and because they "likely confused and misled the jury." The eleventh question of the jury charge asked the jury whether Strickland and Pathfinder had created a partnership, and the jury responded that they had not done so. The charge instructed the jury to answer questions twelve and thirteen only if it had answered "Yes" to question

39

eleven, so the jury did not answer questions twelve and thirteen, which asked about the date that a partnership was formed and the date that it terminated, if any.[23] Strickland contends that it did not have the burden to prove either date and that the jury was "likely . . . confused by the lack of evidence" concerning the dates.[24]

Even if we were to agree with Strickland that the trial court's submission of questions twelve and thirteen to the jury was inappropriate,[25] the supreme court has explained that submission of an improper jury question

> can be harmless error if the jury's answers to other questions render the improper question immaterial. *Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 750 (Tex. 1980); *Texas & New Orleans R.R. Co. v. McGinnis*, 130 Tex. 338, 109 S.W.2d 160, 163 (1937). A jury question is considered immaterial when its answer can be found elsewhere in the verdict or when its answer cannot alter the effect of the verdict. *Fleet v. Fleet*, 711 S.W.2d 1, 2 (Tex. 1986); *C. & R. Transp., Inc. v. Campbell*, 406 S.W.2d 191, 194 (Tex. 1966); *Powers v. Standard Accident Ins. Co.*, 144 Tex. 415, 191 S.W.2d 7, 9 (1945). Submission of an immaterial issue is not harmful error unless the submission confused or misled the jury. *Bailey*, 609

---

[23]During its closing argument, Strickland proposed that the partnership was created on September 13, 2005 through a phone conversation and that it had possibly never ended.

[24]Similarly, in the trial court's charge conference, Strickland objected to question numbers twelve and thirteen, stating, "The date on which the partnership was formed or terminated is irrelevant, not an issue in this case, and it's intended only to confuse the jury." The trial court overruled this objection.

[25]Appellees argue that questions twelve and thirteen were relevant because they determined which law could apply to a partnership between Strickland and Pathfinder. *See Ingram v. Deere*, 288 S.W.3d 886, 894 n.4 (Tex. 2009) (explaining that partnerships formed on or after January 1, 2006 are governed by a different law than partnerships created before that date).

40

S.W.2d at 750; *H.E. Butt Grocery Co. v. Johnson*, 226 S.W.2d 501, 504 (Tex. Civ. App.—San Antonio 1949, writ ref'd n.r.e.). When determining whether a particular question could have confused or misled the jury, we "consider its probable effect on the minds of the jury in the light of the charge as a whole." *Texas Employers Ins. Ass'n v. McKay*, 146 Tex. 569, 210 S.W.2d 147, 149 (1948) (citing *Russell v. Great Am. Indem. Co.*, 127 Tex. 458, 94 S.W.2d 409, 410 (1936)).

*City of Brownsville v. Alvarado*, 897 S.W.2d 750, 752 (Tex. 1995); *see also*

*Crowson v. Bowen*, 320 S.W.3d 486, 489 (Tex. App.—Fort Worth 2010, no pet.)

("Submission of an immaterial issue is not harmful unless it confuses or misleads

the jury, which we determine by considering its probable effect on the jury in light

of the charge as a whole.")

In *City of Brownsville*, a man had committed suicide in a city jail, and his

parents had sued the city for negligence. 897 S.W.2d at 751. The trial court

submitted a jury question about the city's negligence and a question about the

decedent's negligence or intentional conduct, and the plaintiffs argued that the

submission of the latter question was erroneous and harmful. *Id.* at 752. On

appeal, the city contended that because the jury had answered the first question

by finding that the city was not negligent, the submission of the second question

was harmless. *Id.* The supreme court agreed, stating,

> Assuming without deciding that submission of Question 2 ([the decedent's] negligence) was improper, it was plainly immaterial in light of the jury's "no" answer to Question 1 (the City's negligence). Once the jury found in answer to Question 1 that the City did not proximately cause Ricardo's death, the City was exonerated of liability, and neither an affirmative nor a negative answer to Question 2 could have altered the verdict. Reading the charge as a whole, we do not find that any of the questions submitted were ambiguous or

41

misleading. The cause of death and the fact of suicide were never in doubt; the jury was simply asked to identify who was responsible. . . . Under these circumstances, the submission of Question 2 was not harmful error.

*Id.* at 752–53.

Similarly, we conclude that the submission of questions twelve and thirteen was harmless in this case. The submission of those questions was immaterial and was not likely to confuse the jury because the trial court instructed the jury to answer each question carefully without considering the effect of the answer; question eleven provided detailed instructions about the factors that show the existence of a partnership, and those instructions did not condition such existence on the discernment of a particular date of creation or termination; the jury found in question eleven that a partnership did not exist,[26] question eleven preceded questions twelve and thirteen; and the charge informed the jury to answer questions twelve and thirteen only if they found that a partnership existed in answering question eleven. *See id.*; *see also Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 750 (Tex. 1980) (holding that the potentially erroneous submission of defensive theories was harmless error because the jury found for the defendant on independent grounds and the complaining party failed to show how it probably resulted in an improper verdict). Because we conclude that Strickland did not suffer harm by the allegedly erroneous inclusion of questions

---

[26]As explained above, the evidence is factually sufficient to support this finding.

twelve and thirteen of the jury charge, we overrule the last part of its second issue.  *See* Tex. R. App. P. 47.1; *City of Brownsville*, 897 S.W.2d at 752–53.

**Conclusion**

Having overruled both of Strickland's issues, we affirm the trial court's judgment.

WILLIAM BRIGHAM
JUSTICE

PANEL:  GARDNER and WALKER, JJ.; WILLIAM BRIGHAM (Senior Justice, Retired, Sitting by Assignment).

DELIVERED:  September 5, 2013