

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-13-00047-CV

TEXAS DEPARTMENT OF TRANSPORTATION, Appellant

V.

JACQUELINE INGRAM, Appellee

On Appeal from the 123rd District Court
Panola County, Texas
Trial Court No. 2011-459

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

O P I N I O N

During the early morning of November 20, 2009, Jacqueline Ingram drove over loose gravel on a curved stretch of Texas Farm-to-Market Road 699, which caused her "vehicle to lose traction, careen off the roadway, and flip onto its roof" into a ditch. The Texas Department of Transportation (TxDOT) completed a limestone rock asphalt ("pre-mix") overlay on this same curved road approximately twelve hours before the accident. Two other cars "in short intervals, one after the other" also had accidents after losing traction on the loose pre-mix. Ingram sued TxDOT under the Texas Tort Claims Act (TTCA), alleging that the repairs to the road were conducted improperly using the wrong materials, that warning signs notifying motorists of loose gravel should have been posited, and that excess gravel or pre-mix should have been swept away in order to keep the road safe.

TxDOT filed a plea to the jurisdiction and a no-evidence motion for summary judgment arguing that Ingram's evidence did not raise a fact question with respect to the requirement that she show TxDOT's actual knowledge of the dangerous condition. The trial court rejected TxDOT's position, in effect ruling that it could not interpose governmental immunity. TxDOT has appealed. We find that because there was no evidence of TxDOT's actual knowledge of a dangerous condition at or before the time of the accident in this case, suit against TxDOT for this premises defect was barred by the TTCA, and the plea to the jurisdiction should have been granted. Accordingly, we reverse the trial court's judgment and render a judgment of dismissal.

## I. Jurisdiction and Standard of Review

Appellate courts have authority to review interlocutory orders only when authorized by statute. *Bally Total Fitness Corp. v. Jackson*, 53 S.W.3d 352, 352 (Tex. 2001). Section 51.014 of the Texas Civil Practice and Remedies Code allows an appeal from an interlocutory order that "grants or denies a plea to the jurisdiction by a governmental unit" including state agencies such as TxDOT. TEX. CIV. PRAC. & REM. CODE ANN. §§ 51.014(a)(8), 101.001(3)(A) (West Supp. 2012).

### A. Plea to the Jurisdiction Standard of Review

We review de novo the question of whether the trial court had subject-matter jurisdiction. *Tex. Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002). The plaintiff bears the initial burden to allege facts affirmatively demonstrating the trial court's jurisdiction to hear a case. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225–26 (Tex. 2004); *Tex. Dep't of Transp. v. Ramirez*, 74 S.W.3d 864, 867 (Tex. 2002) (per curiam); *City of Paris v. Floyd*, 150 S.W.3d 224, 226 (Tex. App.—Texarkana 2004, no pet.) (citing *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993)). Generally speaking, a "plea should be decided without delving into the merits of the case," but the claims may provide "the context in which a . . . plea is raised." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). In determining whether jurisdiction exists, we accept the allegations in the pleadings as true and construe them liberally in favor of Ingram. *See Miranda*, 133 S.W.3d at 227; *Cnty. of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002); *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993); *Floyd*, 150 S.W.3d at 226.

In cases such as this one, "disputed evidence of jurisdictional facts that also implicate the merits of the case may require resolution by the finder of fact." *Miranda*, 133 S.W.3d at 226. Because TxDOT also challenged the existence of jurisdictional facts, we consider relevant evidence submitted by the parties if necessary to resolve the jurisdictional issues raised. *Id.* at 227 (citing *Blue*, 34 S.W.3d at 555); *see City of Waco v. Kirwan*, 298 S.W.3d 618, 622 (Tex. 2009). "If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the fact finder." *Miranda*, 133 S.W.3d at 227–28. However, if the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law. *Id.* at 228 (noting that standard is similar to no-evidence motion for summary judgment). We are to "take as true all evidence favorable to the nonmovant." *Id.*

### B.    TCCA Waivers of Sovereign Immunity

"In Texas, sovereign immunity deprives a trial court of subject matter jurisdiction for lawsuits in which the state or certain governmental units have been sued unless the state consents to suit." *Miranda*, 133 S.W.3d at 224 (citing *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999)). The TTCA provides a limited waiver of sovereign immunity. TEX. CIV. PRAC. & REM. CODE ANN. §§ 101.001–.109 (West 2011 & Supp. 2012). In this case, TxDOT claims that it enjoys immunity from suit. *See Miranda*, 133 S.W.3d at 224; *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999).

TxDOT is immune from suit as a governmental entity unless the TTCA expressly waives immunity. "A governmental unit in the state is liable for: . . . (2) personal injury . . . so caused

4

by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(2). "'Liability for premises defects is implied under section 101.021(2) because a premises defect arises from a condition existing on real property.'" *City of Haltom City v. Aurell*, 380 S.W.3d 839, 845 (Tex. App.—Fort Worth 2012, no pet.) (quoting *Perez v. City of Dallas*, 180 S.W.3d 906, 910 (Tex. App.—Dallas 2005, no pet.)). Thus, the TTCA expressly waives sovereign immunity for premises defects and injuries arising out of conditions or use of property. *Miranda*, 133 S.W.3d at 225 (citing *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 611 (Tex. 2000)).

"If a claim arises from a premise defect on a toll highway, road, or street, the governmental unit owes to the claimant only the duty that a private person owes to a licensee on private property." TEX. CIV. PRAC. & REM. CODE ANN. § 101.022(c). A party owing that duty with respect to a premise defect must not "injure a licensee by willful, wanton or grossly negligent conduct, and . . . [must] use ordinary care either to warn a licensee of, or to make reasonably safe, a dangerous condition of which the owner is aware and the licensee is not." *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 237 (Tex. 1992); *Aurell*, 380 S.W.3d at 845 (citing *Corbin v. City of Keller*, 1 S.W.3d 743, 747 (Tex. App.—Fort Worth 1999, pet. denied)).

However, Section 101.022's limitation of the government's duty does not apply to the duty to warn of special defects such as excavations or obstructions on highways, roads, or streets. TEX. CIV. PRAC. & REM. CODE ANN. § 101.022(b). Thus, if the defect is a special defect, the

5

claimant is treated as an invitee, and sovereign immunity is waived under the TTCA for injury resulting from that special defect of which the governmental entity is or should be aware. *Univ. of Tex. at Austin v. Hayes*, 327 S.W.3d 113, 117 (Tex. 2010) (per curiam); *Denton Cnty. v. Beynon*, 283 S.W.3d 329, 331 (Tex. 2009).

Also, the TTCA does not effect a waiver of immunity for a claim arising from "the failure of a governmental unit to perform an act that the unit is not required by law to perform" or that is at "the discretion of the governmental unit." TEX. CIV. PRAC. & REM. CODE ANN. § 101.056; *see* TEX. CIV. PRAC. & REM. CODE ANN. § 101.060(a)(1). Unless the dangerous condition in this case can be considered a special defect or there was some specification requiring placement of loose gravel signs, the choice to omit the sign was a discretionary act. *See City of Houston v. Cogburn*, No. 01-11-00318-CV, 2013 WL 1136553, at *8 (Tex. App.— Houston [1st Dist.] Mar. 19, 2013, no pet. h.) (mem. op.) ("The existence of a special defect, however, is an exception to the rule that a governmental entity does not waive immunity for a discretionary act. *See State v. Wollesen*, 93 S.W.3d 910, 913 (Tex. App.—Austin 2002, no pet.) (stating that 'regardless of whether the governmental act was discretionary, the State waives its immunity for the duty to warn of special defects') (citing *State v. Rodriguez*, 985 S.W.2d 83, 85 (Tex. 1999) (per curiam), *abrogated on other grounds by Denton Cnty. v. Beynon*, 283 S.W.3d 329 (Tex. 2009)); *see also Kelly v. City of La Marque*, No. 01–00–01068–CV, 2002 WL 1435924, at *3 (Tex. App.—Houston [1st Dist.] July 3, 2002, pet. denied) (not designated for publication) ('Even if the decision in question is discretionary, when a resulting condition

6

constitutes a special defect, the governmental unit has an obligation to place a warning device; otherwise, it waives its immunity.'")).

## C.     This is Not a Special Defect Case

At trial, it was agreed that "the loose material on the roadway does not constitute a special defect." Ingram even argued to the court that this was not a special defect case because "there's not an obstruction." However, the proper application of the TTCA, and the question of which duty to apply, is a question of law subject to de novo review. *Tex. Dep't of Transp. v. Perches*, 388 S.W.3d 652, 655 (Tex. 2012) (per curiam) (citing *Benyon*, 283 S.W.3d at 331).

The class of special defects is narrow. *Hayes*, 327 S.W.3d at 116. While the TTCA does not define special defect, it likens it to "excavations or obstructions on highways, roads, or streets." TEX. CIV. PRAC. & REM. CODE ANN. § 101.022(b); *see Benyon*, 283 S.W.3d at 331. "The Texas Supreme Court has made clear that the only test for a special defect is whether the condition is of the same class as an excavation or obstruction." *Tex. Dep't of Transp. v. Peterson*, No. 12-10-00412-CV, 2011 WL 5166409, at *2 (Tex. App.—Tyler Oct. 31, 2011, no pet.) (citing *Benyon*, 283 S.W.3d at 331 n.11). "[C]onditions that are not like excavations and obstructions are not special defects merely because they are unexpected or unusual." *Id.* (citing *Reyes v. City of Laredo*, 335 S.W.3d 605, 606 (Tex. 2010)).

In a case involving a plaintiff who travelled on loose gravel after a repair had been made by TxDOT, the Texas Supreme Court held that a layer of loose gravel did not fit within the same class as an obstruction or excavation. *Tex. Dep't of Transp. v. York*, 284 S.W.3d 844, 848 (Tex. 2009) (per curiam). Relying on *York*, the Texas Supreme Court in 2009 also rejected the idea

7

that a layer of loose gravel was a special defect but opined that "a sizable mound of gravel" could be considered an obstruction. *Tex. Dep't of Transp. v. Gutierrez*, 284 S.W.3d 848, 850 n.2 (Tex. 2009) (per curiam). We explore whether the condition in this case was more like a layer of loose gravel or a sizable mound of gravel.

In 2010, the Texas Supreme Court explained in *Reyes v. City of Laredo*,

> The Act does not define "special defect," and so, "[u]nder the ejusdem generis rule, we are to construe 'special defect' to include those defects of the same kind or class as the ones expressly mentioned"—that is, excavations and obstructions on roadways. *Cnty. of Harris v. Eaton*, 573 S.W.2d 177, 179 (Tex. 1978).[1] *Webster's* defines an excavation as a cavity and an obstruction as an impediment or a hindrance, WEBSTER'S THIRD NEW INT'L DICTIONARY 791, 1559 (1981), but not every hole or hindrance is special; otherwise, the statutory limitation on the government's duty would amount to little. We have described the class of conditions intended by the statute as those which, because of their size or "some unusual quality outside the ordinary course of events," *City of Dallas v. Reed*, 258 S.W.3d 620, 622 (Tex. 2008) (per curiam), pose "'an unexpected and unusual danger to ordinary users of roadways.'" *Texas Dep't of Transp. v. York*, 284 S.W.3d 844, 847 (Tex. 2009) (per curiam) (quoting *Payne*, 838 S.W.2d at 238). Thus, for example, a layer of loose gravel on the roadway surface, while a hindrance, is not a special defect because it does not "physically block the road," *York*, 284 S.W.3d at 847, or "present the same type of 'unexpected and unusual danger to ordinary users of roadways'" intended by the statute, *id*. at 848 (quoting *Payne*, 838 S.W.2d at 238). But "a sizeable mound of gravel . . . left on the roadway" could be a special defect. *Id*.

*Reyes v. City of Laredo*, 335 S.W.3d 605, 607 (Tex. 2010).[2]

---

[1]Because the statute does not create an exhaustive list, we must only decide whether the defect is of the same kind or class as an excavation or obstruction. *Cnty. of Harris v. Eaton*, 573 S.W.2d 177, 179 (Tex. 1978); *City of Grapevine v. Roberts*, 946 S.W.2d 841, 843 (Tex. 1997) (per curiam).

[2]The eleventh edition of *Merriam-Webster's Collegiate Dictionary* defines "hinder" as "to make slow or difficult the progress of" or "to hold back." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 588 (11th ed. 2006). It includes obstruct as a synonym. "OBSTRUCT implies interfering with something in motion or in progress by the sometimes intentional placing of obstacles in the way." *Id*.; *see Boorhem-Fields, Inc. v. Burlington N. R.R. Co.*, 884 S.W.2d 530, 538 (Tex. App.—Texarkana 1994, no writ) ("An obstruction is a hinderance, obstacle, or barrier.").

8

But again, obstructions can be special defects "'only if they pose a threat to the ordinary users of a particular roadway.'" *Beynon*, 283 S.W.3d at 331 (quoting *Payne*, 838 S.W.2d at 238 n.3).[3] In deciding whether a condition is within the class of a special defect, we consider characteristics of the class of special defects, such as (1) the size of the condition, (2) whether the condition unexpectedly and physically impairs a vehicle's ability to travel on the road, (3) whether the condition presents some unusual quality apart from the ordinary course of events, and (4) whether the condition presents an unexpected and unusual danger to the ordinary users of the roadway. *Hayes*, 327 S.W.3d at 116 (citing *York*, 284 S.W.3d at 847).

Ingram's petition argued that the defect "posed an unreasonable risk of harm given the large volume of gravel, and/or the kind and character of the same, and that the gravel was laid on a sharp curve in the road, where vehicle traction would be most critical." The total length of the overlay was 600 feet and covered both lanes of traffic. The accident occurred at 4:30 a.m., and visibility on the road could have been impaired. Photographs taken at the accident scene

_____

[3]*Benyon*, decided prior to *Reyes*, contains the following footnote:

> A 1999 per curiam opinion from this Court appeared to add a second element to the definition, stating "[a] special defect must be a condition of the same kind or class as an excavation or roadway obstruction *and* present 'an unexpected and unusual danger to ordinary users of roadways.'" *State v. Rodriguez*, 985 S.W.2d 83, 85 (Tex. 1999) (per curiam) (citation omitted) (emphasis added)[, *abrogated on other grounds by Denton Cnty. v. Beynon*, 283 S.W.3d 329 (Tex. 2009) (quoting *Payne*, 838 S.W.2d at 238)]. The TTCA itself says nothing about "unexpected and unusual danger." That phrase first appeared in 1992 in *Payne*. In that case, we observed that excavations and obstructions "present an unexpected and unusual danger to ordinary users of roadways." *Payne*, 838 S.W.2d at 238. The TTCA mandates no second prong, nor does *Payne* engraft one; the statutory test is simply whether the condition is of the same class as an excavation or obstruction. We used "unexpected and unusual danger" in *Payne* to *describe* the class, not to *redefine* it. Nor does the case upon which *Payne* rests, *Eaton*, 573 S.W.2d at 179, mandate that the condition, besides being like an excavation or obstruction, also pose an unexpected and unusual danger to ordinary roadway users.

*Beynon*, 283 S.W.3d 331 n.11.

9

allegedly showed "the gravel that came out of this mat that was laid and a pitting that you can see the clods that's called flux balls, it came out."

However, the photographs to which reference was made were never introduced as evidence and are, therefore, not before this Court for consideration. While repairs were made to both lanes of the roadway, there is no evidence suggesting that the loose gravel was on both sides of the roadway. In fact, deposition testimony refers to "loose material on the edge of the pavement" and suggested that the "flux balls or . . . pitting" was "on the outside edge of the front slope" of the roadway shoulder. Thus, without more, we cannot determine that the dangerous condition physically blocked the roadway such that a motorist could not have avoided the obstacle.[4] *See City of Denton v. Paper*, 376 S.W.3d 762, 764–65 (Tex. 2012) (per curiam) (finding hole that was "'a few inches'" deep or "'almost a pencil length deep'" was not special defect where no mention was made of width and "ample room existed . . . to navigate around this hole"). Accordingly, we conclude that the loose pre-mix in this case did not constitute a special defect.

---

[4]In *Texas Department of Transportation v. O'Malley*, 28 S.W.3d 652 (Tex. App.—Corpus Christi 2000, pet. denied), our sister court wrote,

> Like an excavation or obstruction, a roadway covered with an excessive amount of loose gravel is not something motorists can reasonably be expected to anticipate. In the instant case, a stretch of roadway, 200 feet in length and consisting of a curve, was covered with one-half cubic yard of loose gravel. We conclude the loose gravel condition presented an unexpected and unusual danger to the ordinary user of FM 766.

*Id.* at 656. We cannot conclude, based on the record before us, that the entire roadway was covered, or that the loose gravel was excessive.

10

## II. Ingram's Evidence Did Not Raise Issue of TxDOT's Actual Knowledge

To prevail on her premises defect claim under the TTCA, absent her having shown that a "special defect" existed, Ingram was required to show that the condition of the premises created an unreasonable risk of harm, that TxDOT actually knew of the condition, that Ingram did not actually know of the condition, that TxDOT failed to exercise ordinary care to protect her from the dangerous condition, and that TxDOT's failure to exercise ordinary care proximately caused her injury. *Aurell*, 380 S.W.3d at 845–46 (citing *Corbin*, 1 S.W.3d at 748; *Payne*, 838 S.W.2d at 237). A November 20, 2009, Texas Department of Public Safety accident report stated that Ingram "lost control" "[d]ue to gravel on the roadway." The same conclusion was reached in the two accidents that followed Ingram's and is not contested.

Instead, the focus of this case is whether Ingram successfully raised a fact issue of whether TxDOT possessed actual knowledge "'at the time of the accident, not merely [knowledge] of the possibility that a dangerous condition c[ould] develop over time.'" *City of Corsicana v. Stewart*, 249 S.W.3d 412, 413–14, 416 (Tex. 2008) (per curiam) (quoting *City of Dallas v. Thompson*, 210 S.W.3d 601, 603 (Tex. 2006)). Constructive knowledge, "which can be established by facts or inferences that a dangerous condition could develop over time[,]" is not enough. *Id.* at 415. This is not to say that circumstantial evidence cannot establish actual knowledge, but "[c]ircumstantial evidence establishes actual knowledge only when it 'either directly or by reasonable inference' supports that conclusion." *Id.* at 415 (quoting *State v. Gonzalez*, 82 S.W.3d 322, 330 (Tex. 2002)).

11

The evidence consists of deposition testimony of TxDOT employees and an expert witness hired by Ingram. At this stage in the proceedings, we take as true all evidence favorable to Ingram and decide if there is a fact question on TxDOT's actual knowledge for the jury to resolve. *Miranda*, 133 S.W.3d at 227–28.

Jeffrey Kyle Weatherford was the TxDOT maintenance department supervisor who ordered his crew to complete "a surface level-up with limestone rock asphalt," also called a "pre-mix overlay," on the morning of the accident. Weatherford testified that the procedure is conducted by spraying "an appropriate tack coat, which is a liquid emulsion asphalt" "on the roadway that [is] being leveled-up," then applying an "amount of the limestone rock asphalt or pre-mix" "while rolling it in application levels" with a blade or a maintainer. He testified that the road would not have to be swept afterward if the procedure was properly done and that by visual inspection, "we can see how that material is acting, how it responds to the oil, how it sets up. As we blade and roll it, then we can determine whether or not it is sticking." He assured,

> Once it is laid down and the final roll is on it, then we can look at that and say that is a good patch, that a material has worked as it should. If there is going to be a problem with the material, then we would be able to see during that application that something was not working for whatever reason.

Weatherford did not look at the finished repair, which was completed at approximately 4:30 p.m. on November 19, 2009.[5]

---

[5]Although Weatherford said that normal traffic would not cause loose material to pop up or come loose, he testified that prior to the accident, "it was mentioned to some of my employees that at some point in the early evening hours after we had left, along 6:30, 7:00 o'clock, that it was noticed that a truck haul, which is a large number of heavy trucks, had started to come through there" and that it was possible the damage to the repair was caused by a truck driving over it.

12

After the accident, Weatherford was "notified by the sheriff's office . . . that there was an accident at this location." Keith Johnson, who was the assistant maintenance supervisor, inspected the road after all three accidents, found "a little bit of loose stuff on the roadway that had come loose overnight," and decided to deploy a crew to sweep the area. TxDOT was required to "go back and tack and put down another portion of pre-mix" to repair the road. It also implemented a new policy requiring warning and advisory signs on the road after applying limestone rock asphalt to patch a road.

Crew Leader, Darrell Thomas LaGrone, managed the crew as they were completing the work and was the last one to leave the repair site. He testified that he "r[o]de the curb to make sure [it was] smooth" at a speed "probably even faster" than the speed limit and that he concluded there was no reason to sweep the area before leaving since it "was holding good." During the repair, which occurred one lane at a time, LaGrone employed a traffic control plan and "flagging operation to move people around" the work site and keep traffic "flowing."

Ingram hired Eldon McCurley,[6] who had worked for TxDOT for over thirty-nine years and was a maintenance supervisor for twenty years, as her expert witness. McCurley originally questioned (1) whether the right materials were used given the cold temperatures on that November day, (2) whether the materials used were properly applied, and (3) whether drivers should have been warned about loose gravel.

---

[6]At the time of his deposition, McCurley was "an adjunct instructor primarily teaching road maintenance and low cost safety improvements" at "Bryan, College Station" for "[c]ounty and city and some TX-DOT employees."

13

McCurley began by agreeing that limestone rock asphalt was a common product that had been used by TxDOT since "1964, and I don't know how far back before that." According to TxDOT's questions, the standards specification book[7] refers to limestone rock asphalt as a "cold mix material" as opposed to a hot mix. McCurley testified that hot mix should be used in colder months and "is a more dependable material than the" limestone rock asphalt. Yet, he admitted that TxDOT product specifications do not differ depending on the time of year and agreed that the product is "[p]retty much an all weather product."

On the day of the repair, the high temperature reading was sixty-three degrees Fahrenheit, while the low temperature was thirty-nine degrees. McCurley pointed out that page 253 of the standards specification book required the roadway surface temperature to be "60 degrees Fahrenheit or higher unless otherwise approved" for cold mix. According to McCurley, in colder temperatures, the product is "not near[ly] as workable" as it is in warm temperatures, and "[y]ou can have clods in it. . . . [and] it's going to be stiffer." Even Weatherford testified, "You would not want to [use the product] in definitely cold temperatures. Asphalt doesn't do well in cold temperatures unless it's designed for that application. This particular material and asphalt we were using would have some temperature limitations on it." However, McCurley admitted that there was no record of the road surface temperature on the date in question, which prompted this exchange:

> Q.    And so if they were applying the product -- did you read in the deposition where they were applying the product in the afternoon?

_____

[7]The "standards specification book" was neither introduced into evidence nor otherwise included in the record, in whole or in part except by oral reference.

14

A.      Correct.

Q.      And that's going to be the warmer part of the day?

A.      Sixty-three degrees.

Q.      Okay.

A.      Yeah.

Q.      So you don't have any problem with the temperature that they were applying the product at?

A.      No.

McCurley next questioned whether the limestone rock asphalt was too old to be safely used. He explained, "there is less flux oil added to the material at the plant when they make it in the winter months to make it more workable than they do in the summer months."[8] However, McCurley stated that pre-mix "doesn't have a shelf life." McCurley also stated that a shipment of limestone rock asphalt was received by TxDOT in October, a month before the repair, and that if this mix was used, it "[s]hould have been a winter mix."

McCurley believed no tack coat had been applied because while the "daily worksheet [showed] . . . the tack coat," someone "drew [a line] through it." The line on the worksheet led McCurley to the following conclusion: "That's telling me that he didn't use the tack coat, or if they did use the tack coat, he was using, as he stated, they have CSS1. The spec book called for CSS1H as a tack coat should be used." The difference between CSS1 and CSS1H was not explained. Further, although McCurley's opinion was derived after reviewing LaGrone's

---

[8]Johnson testified that the pre-mix was "tacky" and was already mixed with oil. Questions from Ingram's attorney suggested that witnesses claimed there was "quite a bit of loose material and the road was slippery even to walk on with your feet" and suggested that additional flux oil along with the tack oil might have caused the slippery situation.

15

deposition testimony—LaGrone had testified, "We put a light tack of oil at the very first. That's what holds -- the pre-mix has oil in it itself. But we put the oil, it's CFS-1 H oil, we put it on the road to be able to help adhere the, you know, asphalt to it."

Photographs taken at the accident scene (which are not in the record) allegedly showed "the gravel that came out of this mat that was laid and a pitting that you can see the clods that's called flux balls, it came out." It also appeared that "some of the aggregate . . . had been stripped." McCurley believed that a pneumatic roller should have been used instead of an iron roller because limestone rock "crushes easily," but he also stated, "[T]hat's a rubber tire . . . and they said they might have used a truck that's got rubber tires on it, of course." He added that TxDOT "should have put up loose gravel signs" but agreed that "[t]he sign should be removed as soon as there is no longer any loose gravel."

McCurley questioned whether LaGrone actually traversed the road prior to leaving because, if the final check was properly completed, he would not expect to find the road crumbling less than twenty-four hours after its completion. Yet, McCurley engaged in the following exchange:

> Q.    When they're -- you read how they were doing the work, how they were doing 600-foot patching job on a -- in a two-lane road, both lanes; right?
>
> A.    Correct, yes, sir.
>
> Q.    Okay. It's my understanding whenever you do that, you've got to shut down one lane of traffic while you're putting down the -- the one lane of patching material.
>
> A.    Yes.

16

. . . .

Q. And so you -- you put down one -- one lane for 600 feet, and you've got the traffic going on the -- the old surface at that time, and then you -- you change it over; correct? And then you're doing the old surface and you're letting the traffic travel on that newly patched surface; is that correct?

A. Yes.

Q. Okay. So -- so that while the TX-DOT crew is out there putting on that second lane of patching, they're able to observe how it's holding up from that first lane that they did; correct?

A. Yes.

. . . .

Q. And if you -- if you see that there's problems with the material, you're able to see that while you're patching that second lane; correct?

A. Should be able to.

Q. I mean, if it's not holding and you've got traffic on it, you would be able to see -- if you knew what you were doing, you would be able to see that it's not holding like it should?

A. You know, normally when you've got one lane blocked like that and you're working, once you turn the traffic on there, they're going though there five miles an hour or less.
But, yeah, the material you should be able to. An experienced person should be able to look at that material and tell whether or not it's going to hold prior to leaving that job.

There is no direct evidence of TxDOT's actual knowledge of the dangerous condition of the road. It is worthy of emphasis (as stated before) that "[c]ircumstantial evidence establishes actual knowledge only when it 'either directly or by reasonable inference' supports that conclusion." *Stewart*, 249 S.W.3d at 415 (quoting *Gonzalez*, 82 S.W.3d at 330). Even when

17

viewing the evidence in a light most favorable to Ingram, we conclude that a fact question with respect to TxDOT's actual knowledge was not raised. *Miranda*, 133 S.W.3d at 227–28.

McCurley admitted that the pre-mix is an all-weather product and that he had no issues with the temperature at which the product was applied. His testimony about the dependability of the product versus hot mix argues only what he believes to be the best practice; it fails to affirmatively identify any specification that was not met or any procedure that was not utilized. Therefore, it does contribute to the question of TxDOT's actual knowledge at the time Ingram's accident occurred. McCurley's opinion that tack oil was not used, that perhaps some older pre-mix was used, and perhaps that LaGrone did not traverse the road as he testified is nothing more than mere speculation. "A conclusion based on assumptions and approximations is nothing more than bare speculation and suspicion. A mere suspicion is no evidence." *S. Dev. of Miss., Inc. v. Zoning Bd. of City of Marshall*, 366 S.W.3d 732, 740 (Tex. App.—Texarkana 2012, no pet.) (citing *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750–51 (Tex. 2003)). Further, "mere knowledge of an antecedent condition that could have potentially caused a dangerous condition at a later time is insufficient to waive the entity's immunity." *Aurell*, 380 S.W.3d at 849.

McCurley admitted that crewmembers should be able to see problems at the time of the repair and testified that there would be no need to put up loose gravel signs if no loose gravel was visible. TxDOT employees testified that there were no visible problems with the road at the time of completion. All parties agree, in hindsight, that there was some defect with the road. Yet, there was no evidence that TxDOT either failed to follow a specification or had actual

18

knowledge of the dangerous condition at the time of Ingram's accident as required by the TTCA. The plea to the jurisdiction should have been granted.

## III. CONCLUSION

We reverse the trial court's denial of the plea to the jurisdiction and render judgment dismissing the case for lack of subject-matter jurisdiction.


Bailey C. Moseley
Justice

Date Submitted:     September 18, 2013
Date Decided:     October 4, 2013

19